[No. A100705. First Dist., Div. Two. Jan. 20, 2004.]

ALA SINGH et al., Plaintiffs and Respondents, v.
GURDIAL SINGH et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

COUNSEL

Law Offices of Walter W. Whelan, Walter W. Whelan; Berliner Cohen, John F. Domingue and Thomas P. Murphy for Defendants and Appellants.

Cooper, White & Cooper, Stephen D. Kaus, Merrit M. Jones; Law Offices of Mark Cohen and Mark Cohen for Plaintiffs and Respondents.

Taylor & Goins and N. Maxwell Mjelita for Hardev Grewal, Hardev S. Grewal, Kulwant Singh Merok, Nau Nuhai Singh, Lakhbir Singh Johl and Kildip Sidhu as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**LAMBDEN, J.**—The Sikh Temple-San Francisco Bay Area, Inc. (the Sikh Temple)[1] and its current board of directors (also referred to as the Supreme

---

[1] The Sikh Temple is a nonprofit corporation that is also known as Gurdwara Sahib-San Francisco Bay Area, Fremont, California.

Council or Panj Pyaras),[2] Gurdial Singh, Harjot Singh, Amarjit Singh, Gurdev Singh, and Mota Singh, challenge a judgment following a bench trial. The Sikh Temple members Ala Singh, Karnail Singh, Ram Singh, Sukhdev Singh, Harjinder Singh, Joginder Singh, and Gurmeet Singh (collectively respondents or plaintiffs) sued the Sikh Temple and its current board of directors (collectively appellants or defendants) because they alleged that the board of directors or Supreme Council remained in office in violation of Corporations Code section 9220, subdivision (b).[3] The trial court found, among other things, that the Temple's bylaws do not specify a life term for the Supreme Council and section 9220 therefore applies, creating a term of one year. Appellants challenge this ruling, contending that a prior judgment involving them as the defendants should have been given collateral estoppel effect; the ruling violates their First Amendment rights; the ruling represents an unconstitutional entanglement with religion; and the bylaws were not silent regarding the term of office for the Supreme Council. We are unpersuaded by their arguments and uphold the lower court.

## BACKGROUND

The Sikh Temple was incorporated as a nonprofit religious corporation in 1977. Its articles of incorporation provide that the bylaws shall specify the qualifications for members, voting rights, and other privileges of membership. The current bylaws were adopted in 1987.

Article II of the bylaws provides that the general membership shall select and appoint the Supreme Council, or Panj Pyaras. Article II reads: "The principles and practices of the Gurdwara Management will be those espoused by Sikh faith and Gurmat tradition. The institution of Panj Pyaras (five beloved ones) will be revived in order to provide the guidelines for day-to-day functions of the Gurdwara. The Panj Pyaras (five beloved ones) will be selected and appointed by Sadh Sangat or membership of the Gurdwara Sahib [Sikh Temple]. If any of the Panj Pyaras is found unfit for his position, another Panj Pyara shall be selected by the General Body to fill up the vacancy. In the meantime, the Head Priest of the Gurdawara [*sic*] Sahib shall perform the duties of a Panj Pyara."

Article IV concerns the dismissal of a member of the Supreme Council. It specifies that a member of the Supreme Council can be dismissed for breaking the Sikh code of conduct, as prescribed in Rehatnamas; for breaking the Sikh rule of objectivity by indulging in petty politics of factionalism and

---

[2] The parties stipulated that the members of the Supreme Council or Panj Pyaras were the board of directors for the purposes of this lawsuit and the Corporations Code.

[3] All further unspecified code sections refer to the Corporations Code.

name calling; and for being unable to get along with the Supreme Council. Article V sets forth the procedures for selecting the Executive Committee or Parbandhak Committee, which oversees daily management of the Sikh Temple. It provides in relevant part: "The Parbandhak Committee shall consist of eleven members. The Supreme Council will ask for the names of Sewadars from the Sadh Sangat [general membership] every now and then depending upon the availability of vacancy on the Parbandhak Committee. The Supreme Council will ask the Sadh Sangat for nominations. The term of the Parbandhak Committee shall be for a period of two years. A Parbandhak can stay on the Executive Committee for a maximum period of four years. . . ."

Article XVI provides in relevant part that any amendment to the bylaws must "be first presented to the Supreme Council of Panj Pyaras in the form of a petition, identifying major gaps or shortcomings according to Sikh tradition (Rahatmaryada). The Panj Pyaras should examine the petition carefully and submit their recommendations to the General Body of Gurdwara membership. The 3/4 majority of the Sikh membership in General Body can endorse the amendment and the Constitution can be changed accordingly."

In 1988, pursuant to the newly adopted bylaws, the congregation nominated and elected five individuals to serve on the Supreme Council.[4] In 1991, four of the five members of the Supreme Council resigned. The congregation nominated and elected four new individuals. In 1993, all five members of the Supreme Council resigned and, subsequently, the congregation nominated and elected five new members.

In August 1996, a lawsuit was filed, *Dhami v. Tut* (Super. Ct. Alameda County, 1996, No. H-1921025). The plaintiffs sought, among other things, to remove three members of the Supreme Council, declare an earlier election valid or in the alternative order a new election, appoint a receiver, and determine the rights of the parties pursuant to section 9220. This case settled when the parties agreed to a court-supervised election of the Supreme Council. That election occurred on December 22, 1996, and resulted in the election of five Supreme Council members, including Gurdial Singh, Jarjot Singh, Amarjit Singh, and Gurdev Singh, who are appellants in the action before us.

In 1999, one member of the Supreme Council was involuntarily removed pursuant to Article IV of the bylaws. Mota Singh, an appellant in this action, was nominated and selected as a replacement by the congregation. Other than

---

[4] These undisputed facts regarding the history of the Supreme Council come from the statement of decision and/or the judgment.

the filling of this vacancy, no elections for Supreme Council were held between December 22, 1996 and March 31, 2002.

In December 1998, a second lawsuit, *Dhami v. Singh* (Super. Ct. Alameda County, 1998, No. H-204698-5), was filed.[5] The complaint was for declaratory relief, injunctive relief, and a receivership. The plaintiffs alleged that pursuant to section 7710 their action was derivative. They complained that there was an unlawful cancellation of a general election scheduled for December 20, 1998, by the defendants named in that case and the assumption of office by a new board of directors on December 6, 1998, without the benefit of an election. In their first cause of action for declaratory relief, they asserted that the defendants had violated the bylaws by refusing to permit the calling of the congregation to elect members of the Supreme Council and members of the Executive Committee or Management Committee. In the second cause of action, they requested the removal of these directors and officers. In their third cause of action, they alleged that the defendants had been in office for more than 12 consecutive months in violation of section 9220. They also alleged intentional infliction of emotional distress and requested injunctive relief and a receivership.

*Dhami v. Singh* proceeded to a court trial in February 1999; the Honorable John Burke, presiding. The court ruled in favor of the defendants on the first cause of action. Defendants' counsel requested an order reflecting that the first cause of action had been bifurcated for final adjudication "without dealing with the other issues." The court responded that it had ruled for the defense on the first cause of action. As to the second, the removal of directors and officer for breach of the bylaws, the court stated that it was also ruling for the defense on that action. The court continued: "The third cause of action was declaratory relief and injunctive relief in violation of Corporations Code [section] 9220, and I rule for the defense in that. [¶] The fourth cause of action is for intentional infliction of emotional distress. The Court makes no ruling and took no evidence on [this]. [¶] The fifth cause of action is for the injunctive relief for harassing and annoying and threatening, and the Court rules for the defense in that." The court also ruled for the defense on the sixth cause of action. The fourth cause of action was bifurcated for trial and eventually dismissed.

Following this trial, a general body meeting for March 31, 2002, was called by appellants upon verbal notice given to those in attendance at the Sikh Temple meetings on the two Sundays prior to March 31.[6] The verbal notice of the general body meeting did not state an election would be held or that removal of the Supreme Council would be sought.

---

[5] The plaintiffs in this action were Avtar Singh Dhami, Avtar Singh Chahal, Kulwant Singh Mehrok, Amarjit Singh Sidhu, Jagmail Singh Saran, and Devinder Singh Channa.

[6] For the last several years, the annual general body meeting had been held in March.

Respondents submitted a written request to address the congregation at the March 31 meeting. Appellants wrote a letter back to them explaining that they deemed the request to address the congregation as a request to advocate for bylaw amendments and that no vote would take place because they had not followed the procedure set forth in Article XVI.

At the meeting of March 31, 2002, respondent Ram Singh addressed the congregation with the concern that the Supreme Council had been in office since 1996 and no elections had been held. He stated that an election should take place. Respondent Gurmeet Singh also addressed the congregation and he told the congregation that it had complete authority to form or to dissolve the Supreme Council. He then proceeded with the following three proclamations: The congregation has decided that every four years there should be elections for the Supreme Council; the present Supreme Council and Executive Committee are dissolved; and respondents Sukdev Singh, Karnail Singh, Ram Singh, Harjinger Singh, Bhal Ala Singh, and Joginder Singh are the new Supreme Council and they will hold new elections in six months. Following each proclamation, the people attending the meeting orally, and simultaneously, voiced their approval or disapproval.

Following this March meeting, appellants remained as the Supreme Council and refused to vacate. Consequently, on April 3, 2002, respondents filed this action. On April 22, they filed their first amended complaint for judicial determination of the validity of the March 2002 election and for declaratory relief. Respondents asserted that appellants remained in office in violation of section 9220, subdivision (b), which requires annual elections of the board of directors unless the bylaws or articles of incorporation specify otherwise. They requested the court to determine the validity of the election of the Supreme Council on March 31, 2002, or to order a new election and determine the right of the Sikh Temple members to vote pursuant to section 9418, subdivision (c).

The Honorable Julia A. Spain presided over a court trial on this action in June 2002. The parties stipulated that the Supreme Council is the board of directors for purposes of a Corporations Code analysis. The court heard evidence regarding the term of office for the Supreme Council. Respondents argued that members of the Supreme Council were not elected for life and appellants argued that the institution of Panj Pyaras is permanent without any term limit for the Supreme Council. During the trial, the court advised the parties, on its own motion, of its intent to take judicial notice of the court files in the two earlier cases, *Dhami v. Tut* and *Dhami v. Singh*. Appellants objected to the court's taking judicial notice of the entire court files in those

actions, but later both parties stipulated that the court could take judicialnotice of selected documents.[7]

On July 23, 2002, the court issued its tentative statement of decision that the Supreme Council's term had expired and it ordered a new election. Appellants filed written objections asserting, for the first time, that the court was bound by *Dhami v. Singh* on the issue of the Supreme Council's term.

The court's judgment was filed September 4, 2002. The court concluded that *Dhami v. Singh* did not have any res judicata or collateral estoppel effect on the case before it. It found that no final judgment had been entered in *Dhami* and appellants had waived the argument because, despite the court's invitation, they failed to plead, prove, or argue collateral estoppel as an affirmative defense. In addition, the court found the issues litigated in the two actions were not identical. The court explained: "According to the First Amended Complaint in Dhami v. Singh, each and every cause of action arose to some degree from the alleged unlawful cancellation of a general election scheduled for December 20, 1998, by the defendants named in that case and the assumption of office by a new Board of Directors on December 6, 1998, without the benefit of an election. The First Amended Complaint in Dhami v. Singh refers to the members of the Supreme Council *and the members of the Executive Committee* (or Management Committee) as the 'Board of Directors,' and in the third cause of action seeks to limit the term of office for *this collective group* to one year and to compel a new election for this *combined* 'Board of Directors.' In the present case, the plaintiffs request judicial determination of the validity of an election held on March 31, 2002. For purposes of this litigation, the parties stipulated that only the Supreme Council is the corporate board of directors. The First Amended Complaint in this case seeks to compel a new election of the Supreme Council, *exclusive of the Executive Committee.* Thus, the Court finds the issues which were presented for judicial determination in Dhami v Singh are not identical to those presented in the instant action. Defendants failed to carry their burden of proof on this requirement."

The court also found that appellants failed to establish that the Supreme Council's term had been actually litigated or necessarily decided in *Dhami v. Singh.* In addition, the court found there was no privity. None of the plaintiffs in the case before it was a party to the *Dhami v. Singh* action. In a footnote, the court explained that four of the named individual defendants in the action before it were also named defendants in *Dhami v. Singh,* as was the Sikh Temple. The court explained: "[T]hey are the parties 'asserting' collateral estoppel, not the parties against whom preclusion is sought. Therefore, that these four defendants are 'identical' is not determinative."

---

[7] We have received several requests for judicial notice of court documents, which have been granted.

As to the validity and outcome of the election on March 31, 2002, the trial court ruled that it had jurisdiction to decide which persons were entitled to manage the Sikh Temple, including control of significant corporate assets, by applying neutral principles of law, focusing on the bylaws themselves. The court found that the bylaws do not specify the term of office for the Supreme Council and therefore pursuant to section 9220, subdivision (b), the terms of office shall be one year. The court stated that it could not determine the outcome of the March 31, 2002 election from the evidence presented at trial and, since the term of office for each of the current Supreme Council members had expired, it was ordering new elections. The court ordered a new election by written ballot to occur on January 12, 2003.

Since the Sikh Temple had failed to maintain membership records in violation of section 9510, subdivision (a), the court ordered that the Temple undertake to admit members upon application and consent as specified in section 9350, subdivision (b), by applying the standards in Article X and the first sentence of Article XI of the bylaws. For this purpose, it ordered the creation of a membership committee consisting of four representatives appointed by plaintiffs and four representatives appointed by defendants. Any membership disputes that the membership committee was unable to resolve by majority vote were to be submitted to a special master for decision.

On September 10, 2002, judgment in *Dhami v. Singh* was entered.

Appellants filed a timely notice of appeal from the judgment order in this case.

## DISCUSSION

### I. *Collateral Estoppel**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *Jurisdiction*

Appellants contend that the trial court did not have jurisdiction to consider respondents' request for declaratory relief in which they sought a determination of the validity and outcome of the election of March 31, 2002, or their request for a court-ordered election for the Supreme Council. They maintain that the court's decision violated the establishment clause of the First Amendment to the United States Constitution[13] and that the trial court was

---

*See footnote, *ante*, 1264.

[13] The establishment clause of the First Amendment to the United States Constitution states:

"simply not correct to say that the doctrinal issues raised by the references to the Gurmat tradition and the Panj Pyaras were merely incidental to the resolution of this dispute." Respondents counter that the Supreme Council, as the board of directors, maintains control of the property and assets of the Sikh Temple and the court has jurisdiction to resolve disputes concerning the control of property of a religious organization.

The question presented is whether the restraints of the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, as well as the restraints imposed by our state Constitution (Cal. Const., art. I, § 4),[14] permitted the trial court to order an election for the members of the Supreme Council. Clearly, courts cannot intrude into a religious organization's determination of religious or ecclesiastical matters such as theological doctrine, church discipline, or the conformity of members to standards of faith and morality. (*Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923 [98 Cal.Rptr.2d 605]; *Korean Philadelphia Presbyterian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069 [92 Cal.Rptr.2d 275] [competing factions within congregation claimed to be "true" church and any judicial determination would have required courts to interpret and apply religious doctrine].) "Ecclesiastical matters include in the main, creeds and proper modes of exercising one's belief." (*Rosicrucian Fellow. v. Rosicrucian etc. Ch.* (1952) 39 Cal.2d 121, 131 [245 P.2d 481] (*Rosicrucian*).) Thus, we must determine whether the court in the case before us impermissibly intruded into the Sikh's Temple's ecclesiastical matters.

The United States Supreme Court and our state courts have grappled with the question of resolving disputes within religious organizations and excessive entanglement. Accordingly, prior to considering the facts of the case before us, we briefly review the extensive case law in this area.

A. *The United States Supreme Court and State Case Law on the Establishment Clause and Adjudicating Disputes Among Religious Organizations*

The approach of the United States Supreme Court to resolving property disputes involving religious organizations originally developed in *Watson v. Jones* (1871) 80 U.S. (13 Wall.) 679 [20 L.Ed. 666] (*Watson*), which was decided prior to the application of the First Amendment to the States. In

---

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[14] Section 4 of article I of the California Constitution provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."

resolving intra-church schisms or property disputes, the court identified two categories of church polities: congregational and hierarchical. (*Id.* at p. 722.) Although it was concerned with a hierarchical organization, the *Watson* court discussed the court's role in resolving property disputes in congregational organizations: "In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they may have changed in some respect their views of religious truth." (*Id.* at p. 725.)

As already mentioned, *Watson* did not involve a congregational church, but a hierarchical organization. In a hierarchical organization, "the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments." (*Watson, supra,* 80 U.S. at pp. 726–727.) "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Id.* at p. 727.) Accordingly, the Supreme Court in *Watson* refused to resolve a property dispute between a national Presbyterian organization and local churches of that organization, because such a determination would have required the court to determine whether there had been departures from doctrine by the general church. (*Id.* at pp. 733–735.)

California courts interpreted *Watson* as supporting "the rule that civil and property rights [can] be adjudicated." (*Rosicrucian, supra,* 39 Cal.2d at p. 131, citing *Watson, supra,* 80 U.S. 679 and other California cases.)[15] Shortly after issuing its opinion in *Rosicrucian,* our Supreme Court reiterated in *Providence Baptist Church v. Superior Ct.* that courts "will entertain jurisdiction of controversies in religious bodies although some ecclesiastical matters are incidentally involved" as long as civil or property rights are involved. (*Providence Baptist Church v. Superior Ct.* (1952) 40 Cal.2d 55, 60–61 [251 P.2d 10] (*Providence Baptist Church*).) Our Supreme Court in *Providence Baptist Church* focused on the fact that the dispute involved a congregational type of church where its affairs were controlled by the members. "That type exists 'where each local group is in charge of all its affairs through majority vote of its members and there is no control from above.' [Citation.]" (*Providence Baptist Church, supra,* at p. 61.) While acknowledging that there was some authority to the contrary of its holding, our Supreme Court stated: "[I]t has been held that where a religious society has no tribunal but the congregation, a court may determine whether the meeting at which a pastor was removed was properly conducted according to the usage, contracts and rules of the society, or according to pertinent principles of law where civil and property rights, such as the emoluments of the property rights, are involved, and that in so doing the court is not interfering with any ecclesiastical function." (*Id.* at pp. 61–62.)

In *Providence Baptist Church,* our Supreme Court held that it had jurisdiction to consider whether a congregational church had followed its own bylaws and internal procedures in discharging a pastor: "While we may not be dealing with the officer of a corporation in the strict sense (the pastor of a church is involved) the situation is similar and we see no reason why an election cannot be conducted where, as appears, a fair and proper election cannot be conducted by the church and the election previously held was irregular and of no effect. In other words the appropriate body of the church is assisted in acting within its proper sphere, according to its rules and regulations, to protect civil and property rights. If the problem was whether the pastor was preaching a theology contrary to the denominational doctrine or conducting religious services in a manner out of harmony with the ritual of the church, it would clearly not be within the province of a court to interfere,

---

[15] We note that this interpretation of *Watson* differs from the United States Supreme Court's conclusions in *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601]. The *Hull* court quoted *Watson* and then explained: "The logic of this language leaves the civil courts no role in determining ecclesiastical questions in the process of resolving property disputes." (*Hull, supra,* at p. 447, citing *Watson, supra,* 80 U.S. at pp. 728–729.) The *Hull* court noted that later Supreme Court cases, such as *Gonzalez v. Archbishop* (1929) 280 U.S. 1, 16 [74 L.Ed. 131, 50 S.Ct. 5], recognized that marginal civil court review of ecclesiastical determinations is sometimes appropriate. (*Hull, supra,* at pp. 447–448 & fn. 6.)

and the controversy would have to be settled by the church tribunals. But where, as here, the question presented is whether the property and funds of the church are being handled in accordance with the by-laws and rules of the church corporation or such by-laws and rules are being properly observed by the governing body of the church, those aggrieved may seek redress through court action." (*Providence Baptist Church, supra,* 40 Cal.2d at pp. 63–64.)

The same year our Supreme Court decided *Providence Baptist Church,* a Court of Appeal addressed the issue, which is almost identical to the one raised in the case before us, whether the court could order and monitor an election of the directors of a religious corporation. (*Burnett v. Banks* (1955) 130 Cal.App.2d 631 [279 P.2d 579] (*Burnett*).) In *Burnett,* the court adjudicated a dispute between rival church factions regarding a pastor's right to appoint the directors rather than to hold elections by the congregation. (*Id.* at p. 635.) The court explained: "Certainly no directors of a corporation, whatever their number, may perpetuate themselves in office by refusing to call an election." (*Id.* at p. 634.) "It is clear that the court has the right when it appears that a corporation election will not be held because of the failure of its directors to call it, or that such directors will not conduct a free, fair and full election to order one held under court auspices. This is not an ecclesiastical matter but a corporation one. But even if it were ecclesiastical, as the corporation owns real and personal property, the matter would come within the qualified rule set forth in *Rosicrucian. . . .*" (*Id.* at p. 635.)

These California cases specifically concerned congregational organizations, while subsequent cases in front of the United States Supreme Court, such as *Presbyterian Church v. Hull Church, supra,* 393 U.S. 440 (*Hull*), involved hierarchical religious organizations. In *Hull,* the disputes involved a decision by an association of local Presbyterian churches (general church) to take over the property of two local churches that had withdrawn from the association. (*Id.* at pp. 441–443.) In holding that the First Amendment barred courts from adjudicating this property dispute because it would require the court to interpret church doctrine, the *Hull* court set forth the doctrine of "neutral principles" for resolving property disputes: "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the

hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, [citation]; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, states, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." (*Id.* at p. 449.)

About seven years later, the United States Supreme Court again addressed the question of adjudicating property rights within hierarchical religious organizations in *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 708–720 [49 L.Ed.2d 151, 96 S.Ct. 2372] (*Serbian*). The Supreme Court held that civil courts could not properly countermand the decision by the highest authority of the Serbian Orthodox Church to defrock the bishop who presided over its American diocese, notwithstanding that this decision incidentally affected the control of diocesan property. (*Id.* at pp. 708–709.) The court stated that "this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals." (*Id.* at p. 709.) The court concluded: "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." (*Id.* at pp. 724–725.)

The United States Supreme Court further explained and applied the neutral principles of law doctrine in *Jones v. Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020] (*Wolf*). *Wolf* involved a dispute over ownership of church property following a schism in a local church affiliated with a hierarchical church organization. The court stated: "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." (*Id.* at p. 602.) The court explained: "Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. [Citations.] Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt *any* one of various approaches for settling church

property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " (*Ibid.*) In holding that there was no impermissible entanglement with religion in the case before it, the *Wolf* court set forth the "neutral principles of law" approach as requiring a civil court to examine in purely secular terms certain religious documents, such as a church constitution. (*Id.* at p. 604.)

■ Following these later Supreme Court case holdings, particularly that of *Hull* and *Serbian,* some California Courts of Appeal have asserted that the language, if not the holdings, in the earlier California cases of *Rosicrucian, supra,* 39 Cal.2d 121, *Providence Baptist Church, supra,* 40 Cal.2d 55, and *Burnett, supra,* 130 Cal.App.2d 631, is questionable. (See, e.g., *Wilson v. Hinkle* (1977) 67 Cal.App.3d 506, 512 [136 Cal.Rptr. 731]; *Vukovich v. Radulovich* (1991) 235 Cal.App.3d 281, 293 [286 Cal.Rptr. 547].) Of course, California courts concerned with restraints under the First Amendment applicable to the states through the Fourteenth Amendment are bound by the authoritative interpretations of the First Amendment enunciated by the United States Supreme Court. We note that all of the United States Supreme Court cases, unlike the California cases, concerned hierarchical religious organizations; it remains unclear whether the constitutional analysis for congregational and hierarchical religious institutions is identical.[16] However, no matter whether the religious organization is hierarchical or congregational, it is clear that the decisions of the highest religious tribunal on questions of discipline, faith, or ecclesiastical rule, custom, or law must be accepted. (See, e.g., *Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, 919 [152 Cal.Rptr. 854].) "However, when the dispute to be resolved is essentially ownership or right to possession of property, the civil courts appropriately adjudicate the controversy even though it may arise out of a dispute over doctrine or other ecclesiastical question, provided the court can resolve the property dispute without attempting to resolve the underlying ecclesiastical controversy." (*Id.* at p. 920.)

---

[16] Other jurisdictions have held that the constitutional analysis applied to hierarchical organizations is the same as that applied to congregational organizations. (See, e.g., *Nunn v. Black* (W.D.Va 1981) 506 F.Supp. 444, 448 [applied *Serbian* and refused to decide internal church dispute despite church's having "no structured decision-making process"], affd., *Nunn v. Black* (4th Cir. 1981) 661 F.2d 925; *Burgess v. Rock Creek Baptist Church* (D.D.C. 1990) 734 F.Supp. 30 [should apply analysis of *Serbian* to congregational church]; *First Baptist Church of Glen Este v. State of Ohio* (S.D.Ohio 1983) 591 F.Supp. 676, 682 ["because the 'hands off' policy espoused by the *Serbian* Court is of constitutional dimension, we find it difficult to justify the application of a different standard where a congregational church is involved"].) However, none of these cases addresses the issue of adjudicating a property dispute in a congregational organization when no authority in the organization nor the congregation has spoken and the organization has no peaceful procedure in place for deciding the issue.

██ We do not necessarily agree that these California cases decided in the 1950's cannot be reconciled with the United States Supreme Court holdings. None of the California cases stated that courts could adjudicate matters that were predominantly ecclesiastical. To the extent that these cases held that *all* property disputes could be resolved by civil courts, their holdings should be refined to restrict review to the application of neutral principles of law taking care " 'to decide church property disputes without resolving underlying controversies over religious doctrine.' " (*In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850, 858–859 [121 Cal.Rptr. 899] (*Metropolitan Baptist Church*) [jurisdiction to adjudicate distribution of dissolving church's assets and any ecclesiastical concern was incidental and remote]; see also *Wolf, supra,* 443 U.S. at p. 597; *Presbytery of Riverside v. Community Church of Palm Springs, supra,* 89 Cal.App.3d at pp. 925–929 [property dispute can be resolved without attempting to resolve underlying ecclesiastical controversy]; *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599, 615 [171 Cal.Rptr. 541].) " '[A]s long as the court does not have to resolve the doctrinal propriety [of a church's action] in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs.' " (*Metropolitan Baptist Church, supra,* at p. 859.)

B. *Applying Federal and State Precedent to Determine the Constitutionality of Ordering an Election for the Supreme Council*

Respondents requested the trial court to determine that the election in March 2002 was valid or, alternatively, to order a new election because the current Supreme Council's term had expired and the current Supreme Council refused to order an election. Respondents argued that the express terms of the Sikh Temple's bylaws do not specify a term of office for the Supreme Council and therefore the law of the Corporations Code should be applied, which imposes a one-year term limit when the bylaws are silent. (§ 9220, subd. (b).) Appellants responded that their term on the Supreme Council was for life[17] in accordance to the doctrine of the Gurmat tradition and the institution of Panj Pyaras. Any determination of their term of office, appellants asserted, requires the court to violate the establishment clause of the First Amendment because the court would be resolving a dispute regarding religious doctrine.

██ Before trial, the parties stipulated to the fact that the Supreme Council, also known as the Panj Pyaras, is the corporate board of directors for the Sikh Temple. The board of directors is entitled to manage the affairs of the Sikh

---

[17] The bylaws in Article II provide that members of the Supreme Council can be dismissed and replaced by the general membership if found unfit.

Temple, and therefore controls significant corporate assets.[18] Article XII of the bylaws specifies that the Executive Committee "shall consult the Supreme Council in all important financial and policy matters." Since the Supreme Council is involved with the control of the financial assets of the Temple, the term of office for the Supreme Council involves control of the Temple's property. As discussed *ante,* under both federal and state law, courts have jurisdiction over disputes involving the control of property, even if they touch upon ecclesiastical concepts, as long as the court does not have to settle religious schisms and it can use neutral principles of law to settle the dispute. (See, e.g., *Wolf, supra,* 443 U.S. at pp. 602–604; *Metropolitan Baptist Church, supra,* 48 Cal.App.3d at p. 858.)

The Sikh Temple has organized itself as a nonprofit religious corporation and is subject to the rules set forth in section 9110 et seq. Section 9210, subdivision (a) provides that each corporation shall have a board of directors and that the "activities and affairs of a corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the board." Section 9150, subdivision (a) provides: " 'Bylaws,' as used in this part means the code or codes of rules used, adopted, or recognized for the regulation or management of the affairs of the corporation irrespective of the name or names by which such rules are designated."

Of particular interest is section 9220, which provides in relevant part: "(a) The articles or bylaws may provide for the tenure, election, selection, designation, removal, and resignation of directors. [¶] (b) In the absence of any provision in the articles or bylaws, the term of directors shall be one year. [¶] (c) Unless the articles or bylaws otherwise provide, each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified."

The bylaws of the Sikh Temple, as set forth in Article II, provide that the membership will select the Supreme Council or the board of directors. The bylaws do not specify the term of office. Appellants argue that the references to the Sikh faith, Gurmat tradition, and institution of Panj Pyaras in Article II require the court to interpret their religious doctrine.[19] Appellants therefore

---

[18] The record on appeal does not detail these assets, but neither party argued that property interests were not involved. Rather, appellants argued that the adjudication of property interests involved the determination of religious doctrine, which was unconstitutional.

[19] Article II reads: "The principles and practices of the Gurdwara Management will be those espoused by Sikh faith and Gurmat tradition. The institution of Panj Pyaras (five beloved ones) will be revived in order to provide the guidelines for day-to-day functions of the Gurdwara. The Panj Pyaras (five beloved ones) will be selected and appointed by Sadh Sangat or membership of the Gurdwara Sahib. If any of the Panj Pyaras is found unfit for his position,

seek to foreclose any court review based on the mention of the Gurmat tradition and Panj Pyaras in Article II. However, " '[t]here are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property.' [Citation.] And the belief 'that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment' has been consistently repudiated. [Citations.]" (*Metropolitan Baptist Church, supra,* 48 Cal.App.3d at p. 858.)

In support of their position, appellants cite the following language in *Wolf, supra,* 443 U.S. at page 604: "[T]here may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." Here, as appellants concede, there is no authoritative ecclesiastical body,[20] but they argue that the court improperly interpreted the Gurmat tradition and the institution of Panj Pyaras. Appellants, however, ignore the sentence shortly following the quoted passage from *Wolf* that states: "We therefore hold that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." (*Ibid.*) In addition, the *Wolf* court declared: "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum" to settle such disputes. (*Id.* at p. 602.)

Integral to appellants' argument is that the court heard evidence on the meaning of Panj Pyaras and the Gurmat tradition and therefore it unconstitutionally decided the meaning of these terms. Appellants' witnesses testified that the institution of Panj Pyaras is permanent, and therefore no term limit for the Supreme Council exists. They relied upon the fact that the bylaws expressly provide a two-year term limit for the Executive Committee and provide for dismissal of Supreme Council members based on misconduct. Respondents' witnesses, including their expert, Dr. Tarlochan Singh Nahal,

---

another Panj Pyara shall be selected by the General Body to fill up the vacancy. In the meantime, the Head Priest of the Gurdawara Sahib shall perform the duties of a Panj Pyara."

[20] Although they acknowledge there has been no decision by any ecclesiastical tribunal and that the Sikh Temple is congregational in type rather than hierarchical, they point out that Article XII, which sets forth the powers of the Executive Committee, does declare a hierarchy regarding doctrinal issues. Paragraph five reads: "In matters related to the Gurmat and Sikh Rehatmaryada, [t]he Granthi/Priest of the Gurdwara Sahib should be the chief consultant. In matter of doubt, the opinion can be solicited from other Gursikhs, Gyanis and Saints. Sri Akal Takhat is the final authority on all religious matters." The record does not indicate that the Granthi/Priest of the Sikh Temple has spoken regarding the term of office for the Supreme Council.

opined that nothing in the wording of Article II dictated the term of office for the Supreme Council. Witnesses for respondents testified that, although the concept of the Panj Pyaras is eternal, the Sikh tradition is for members to serve as Panj Pyaras for a limited time and purpose before returning to the general congregation or Sadh Sangat.

Appellants contend that the mere fact that the court considered evidence on this issue means that it had to resolve an argument over what Panj Pyaras means. As discussed *ante,* if the court must resolve an incidental issue that is religious in nature, it must first defer to the decision by any ecclesiastical tribunal in the hierarchy of the religious society. (*Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 498 [281 Cal.Rptr. 396].) The record does not establish that any ecclesiastical tribunal, the Granthi/Priest of the Sikh Temple, the congregation, or any other authority in the Sikh Temple has determined the term of office for the Supreme Council. "Where a schism has developed within a church, resulting in dispute as to who holds ultimate authority for congregational or corporate decisions, civil courts are unavoidably put to the task of identifying the true or legitimate authority. [Citation.] To do otherwise would be to deny 'all legal protection to churches and [allow] church disputes to be settled by physical force.' [Citation.]" (*Higgins v. Maher* (1989) 210 Cal.App.3d 1168, 1173 [258 Cal.Rptr. 757].) Accordingly, the court properly heard evidence to determine whether any authority had determined that the reference to Panj Pyaras or the Gurmat tradition in Article II signified a life term. The fact that experts provided differing opinions and no witness pointed to an authoritative decision on this issue within the Sikh Temple, amply established that there was neither a decision nor consensus on this matter.[21]

In this case, the court did not have to determine the meaning of Panj Pyaras, only that no authority in the Sikh Temple had adjudicated this issue. A civil court retains jurisdiction to determine purely secular issues. Here, the court determined that religious doctrine was not relevant to the interpretation of the bylaws and resolved the dispute based on contract law and provisions in the Corporations Code. (See *Berry v. Society of Saint Pius X* (1999) 69

---

[21] It is true that in its statement of decision the court concluded that the "legal significance of designating the Supreme Council as Panj Pyaras in Article II of the bylaws is to require that decisions be unanimous to be binding on the Temple corporation." The court also stated: "Ultimately, the testimony of plaintiffs and their expert. Dr. Tarlochan Singh Nahal, proved by a preponderance of the evidence that there is nothing in the wording of Article II which dictates the term of office for the Supreme Council." The court further explained that it was not determining the meaning of these terms but simply that there was no consensus that they meant a life term. Even if some of these statements indicate an improper consideration of the meaning of these religious terms, such statements do not constitute reversible error because the court's ruling did not rely on defining or settling the meaning of Panj Pyaras or the Gurmat tradition.

Cal.App.4th 354, 365 [81 Cal.Rptr.2d 574] [civil court adjudications require analysis of language of instruments such as deeds, church charters, state statutes governing the holding of church property, and provisions in church constitutions pertaining to ownership and control of church property, taking special care to scrutinize documents in purely secular terms and not to rely on religious precepts].)

■ The court's application of contract law and provisions from the Corporations Code is a neutral-principles approach, which "cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties . . . can modify the deeds or the corporate charter . . . . The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." (*Wolf, supra,* 443 U.S. at p. 606, fn. omitted.) Similarly, here, under Article XVI,[22] the Supreme Council is not without recourse. The Supreme Council can recommend an amendment of the bylaws that the term of office for the Supreme Council is life and put the recommendation to the membership for approval.

■ We therefore conclude that the trial court did not need to determine the meaning of the Panj Pyaras or the Gurmat tradition to interpret the bylaws regarding the term of office for the Supreme Council. Further, the trial court did not determine who was qualified to be a member or who should be a member of the Supreme Council. Rather, the court's ruling that an election should occur resulted from the application of neutral principles of law and the Corporations Code when interpreting the bylaws. We stress that this case is significantly different from those situations where a religious authority has spoken on the issue. Not only has no religious authority spoken, but the Sikh Temple has no viable means of resolving this issue. The bylaws are silent regarding any method of resolving any schism involving the interpretation of the bylaws. We therefore cannot say that the trial court

---

[22] Article XVI provides in relevant part: "The amendments to the constitution must be first presented to the Supreme Council of Panj Pyaras in the form of a petition, identifying major gaps or shortcomings according to Sikh tradition (Rahatmaryada). The Panj Pyaras should examine the petition carefully and submit their recommendations to the General Body of Gurdwara membership. The 3/4 majority of the Sikh membership in General Body can endorse the amendment and the Constitution can be changed accordingly."

overstepped its bounds of jurisdiction in ordering an election when doing so was secular in purpose.[23]

## III. *The Trial Court's Remedies and the Establishment Clause*

Appellants contend that the trial court's remedies for resolving the disputes at the Sikh Temple represent an unconstitutional and excessive government entanglement with religion. Specifically, they complain that the court's interference into their method for accepting and denying membership, the ordering of an election, and the requirement that individuals have equal time to advocate for the election, violated the establishment clause of the First Amendment applied to the states through the Fourteenth Amendment of the United States Constitution.

### A. *The Three-Part Test*

Appellants complain that the remedies imposed by the trial court violate the three-part test regarding government action and the establishment clause set forth in *Lemon v. Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105] (*Lemon*). The United States Supreme Court established three criteria, which must be satisfied to avoid conflict with the establishment clause: First, the challenged government activity must have a secular legislative purpose; second, the principal or primary effect of the activity must be one that neither advances nor inhibits religion; and third, the activity must not foster an excessive government entanglement with religion. (*Id.* at pp. 612–613.)

Under the first criterion, inquiry into the purpose of the challenged government action should be deferential and limited. If the government articulates a plausible secular purpose, this should be accepted absent a contrary showing by the challenger. (*Wallace v. Jaffree* (1985) 472 U.S. 38, 74–75 [86 L.Ed.2d 29, 105 S.Ct. 2479] (conc. opn. of O'Connor, J.).)

---

[23] Although clearly not binding on us, we note that other jurisdictions have concluded that the First Amendment does not bar courts from ordering elections or developing procedures to ensure a fair election in religious institutions. (See, e.g., *McKinney v. Twenty-Fifth Ave. Baptist Ch., Inc.* (Ala. 1987) 514 So.2d 837, 838–839 [ordered members of competing church factions to compile a list of church members eligible to vote in an election]; *Wilkerson v. Battiste* (La.Ct.App. 1980) 393 So.2d 195, 196–197 [court had jurisdiction over claim that board of directors were not elected according to procedures of charter because this is procedural issue and not related to religious law, custom, or policy]; *Pilgrim Rest Missionary Baptist Church v. Wallace* (Miss. 2003) 835 So.2d 67, 72–74 [court had authority to order election regarding pastor's employment].)

Whereas the first criterion of the *Lemon* test involves a determination whether the purpose behind the challenged action is to endorse or disapprove religion, the second or effect criterion "asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." (*Lynch v. Donnelly* (1984) 465 U.S. 668, 690 [79 L.Ed.2d 604, 104 S.Ct. 1355] (conc. opn. of O'Connor, J.).) Applying an objective standard, the question becomes whether the challenged action is sufficiently likely to be perceived by reasonable adherents of the controlling religion as an endorsement, or by reasonable nonadherents as a disapproval, of their individual religious choices. (*Grand Rapids School District v. Ball* (1985) 473 U.S. 373, 390 [87 L.Ed.2d 267, 105 S.Ct. 3216].) The third criterion of the *Lemon* test concerns entanglement with religion and contemplates a determination whether the state will be required to monitor the challenged government activity for its religious content in order to assure that it does not have the unintended effect of encouraging or discouraging religion. (*Lemon, supra,* 403 U.S. at p. 619.)

## B. *Membership Application*

The trial court ruled that, pursuant to section 9350, subdivision (b)[24] and section 9510, subdivision (a),[25] appellants and respondents "shall meet and confer to draft a mutually acceptable membership application, which shall include a reasonable standard for 'regular' attendance, to be presented to the Court for approval as hereinafter provided." The court further explained that membership applications were to be solicited at five consecutive Sunday congregational meetings on dates to be specified. It ruled that a membership committee shall be formed consisting of four representatives appointed by respondents and four representatives appointed by appellants who shall be charged with the duty of admitting or denying membership, advising applicants of their decision with the grounds for any denial, and the preparation and maintenance of a membership list. The court specified that no named party in this action or any of the prior actions involving the Sikh Temple elections could serve on the membership committee. Any disputes over admission to membership, which the membership committee could not resolve by a five-person majority vote, would be submitted to a special master.

---

[24] Section 9350, subdivision (b) provides: "No person is liable for any obligation arising from membership unless the person was admitted to membership upon the person's application or with the person's consent."

[25] Section 9510, subdivision (a) reads: "(a) Each corporation shall keep: [¶] (1) Adequate and correct books and records of account. [¶] (2) Minutes of the proceedings of its members, board and committees of the board. [¶] (3) A record of its members giving their names and addresses and the class of membership held by each. . . ."

Appellants assert that the trial court's decision "has empowered Plaintiffs with authority equal to that of the same Supreme Council . . . ." Appellants argue that no one requested the court to make any decision regarding membership and this decision violates the establishment clause of the First Amendment. Further, they complain that it requires the court to be entangled in the Sikh Temple's religious affairs in violation of the First Amendment.

Appellants' argument that no one requested the court to make any decision regarding membership is without merit. Respondents requested in their first amended complaint that the court "determine the validity of memberships in defendant Gurdwara Sahib to assure a valid election under the by-laws of defendant Gurdwara Sahib, and direct such other and further relief as may be just and proper to assure a valid and peaceful election."

As to their argument that the ruling violates the establishment clause, we apply the *Lemon* test. The first criterion is whether the court has a clear secular purpose. (*Lemon, supra,* 403 U.S. at p. 612; *Wallace v. Jaffree, supra,* 472 U.S. at pp. 74–75.) Under California Corporations law, every religious corporation is mandated to keep "[a] record of its members with their names and addresses and the class of membership held by each." (§ 9510, subd. (a)(3).) The membership records must be kept in writing or in a form capable of being converted into writing. (§ 9510, subd. (b).) The compelling state interest in requiring religious or nonprofit corporations to maintain such a list has been upheld. (See, e.g., *Pacific-Union Club v. Superior Court* (1991) 232 Cal.App.3d 60, 71–81 [283 Cal.Rptr. 287].) It was undisputed at trial that appellants never made or maintained a membership list or roster. Since the membership votes for the offices on the Supreme Council, a fair election can only be held if a list of members can be ascertained. Accordingly, the court's clear purpose was to ensure that the Sikh Temple complied with the law by maintaining a record of membership, and therefore the court's ruling had a secular purpose.

The ruling also satisfies the second criterion in the *Lemon* test in that the ruling neither advances nor inhibits religion. Requiring the Sikh Temple to comply with the statutes governing nonprofit corporations does not convey any message of endorsement or disapproval of the religious practices of the Temple.

Appellants never address the first two criteria of the *Lemon* test, but they do argue, in a conclusory fashion, that the court's action fosters excessive government entanglement with the Sikh Temple, especially since any remaining disputes regarding membership are to be addressed by a special master. Thus, they appear to be arguing the ruling violates the third prong of the

*Lemon* test. Appellants, however, misconstrue this final criterion. It is not the mere fact that the government may have to continue to monitor an activity that constitutes unconstitutional entanglement with religion. Rather, it is whether the court will be required to monitor the activity *for its religious content.* (*Lemon, supra,* 403 U.S. at p. 619.)

In their reply brief, appellants assert that it is well settled that a church has the right to determine its own membership and that courts should not resolve disputes over who is or can be a member. (See, e.g., *Bouldin v. Alexander* (1872) 82 U.S. 131, 139–140 [21 L.Ed. 69].) We agree. However, the court did not rule that it has the discretion to determine who qualifies as a member. Rather, the court is to resolve any disputes regarding the application of the criteria for membership as set forth in the Sikh Temple's own bylaws.

Appellants contend that they should retain the discretion to admit or not admit members even if applicants meet the requirements set forth in Article X of the bylaws. They complain that nothing in the bylaws mandates that they must accept members who meet these threshold requirements. Further, they claim that respondents should not be part of this decisionmaking process since they were never elected to the Supreme Council.

The requirements for admission to membership are specified in the articles of incorporation and bylaws, as required by section 9310, subdivision (a).[26] Article X of the bylaws provides the following regarding membership: "There will be only one class of membership. There is no membership fee. [¶] Definition of a Sadh Sangat member: [¶] 1. Membership of the Gurdwara Sahib is open to a person who is resident of these counties: Santa Clara, Santa Cruz, San Mateo, Alamada [*sic*], Contra Costa, San Francisco, Solano. [¶] 2. Is 18 years of age or over. [¶] 3. Believes in Sikhism, teachings of ten Gurus, Rehatnamas, accepts Guru Granth Sahib as a living Guru. [¶] 4. Pledges to abide by the constitution of the Gurdwara Sahib." Article XI provides, in pertinent part: "The General Body/Sadh Sangat should consist of all those persons who attend the Gurdwara Sahib regularly." The court interpreted this sentence in Article XI as providing grounds for denying or suspending membership due to lack of regular attendance. Nothing in the bylaws indicates that the Supreme Council has the sole authority to determine membership.[27]

---

[26] Section 9310, subdivision (a) declares: "A corporation may admit persons to membership, as provided in its articles or bylaws, or may provide in its articles or bylaws that it shall have no members. In the absence of any provision in its articles or bylaws providing for members, a corporation shall have no members."

[27] Article XIII sets forth the duties and responsibilities of the Supreme Council or Panj Pyaras: "1. The Supreme Council should meet at least once a month. Quorum of the meeting consists of five members. 2. The Supreme Council should select a coordinator among

In the court's order, it made it clear that it recognized that the board of directors could augment the bylaws or develop written operating rules to further refine the process for accepting or denying membership. Thus, the court did not strip the board of directors from exercising their discretion. Rather, the court stated that the board of directors must comply with the law in setting forth the operating rules for accepting members. As the court noted, the bylaws and any operating rules must be applied " '*reasonably and equally*' " to all applicants and members. (See, e.g., *Braude v. Automobile Club of Southern Cal.* (1978) 78 Cal.App.3d 178, 182–185 [144 Cal.Rptr. 169].) If appellants desire to have the Supreme Council retain the ultimate right to accept or deny membership, they must propose such an amendment to the congregation for its approval.

■ The evidence indicates that, currently, appellants maintain an ad hoc method for determining whether to accept or deny applications for membership. Thus, a full and fair election by the members cannot be conducted until criteria for membership are clearly set forth and fairly applied. The trial court established a procedure whereby the membership of the Sikh Temple could be ascertained to ensure a fair election and compliance with the Corporations Code. The court did so in the absence of clear bylaws and a higher religious authority. The order ensures that reasonable notice of the application procedure will be provided and that the application process will be conducted in an orderly manner. The court's order does not create the criteria for membership, nor does it inquire as to the reasons why certain criteria are or are not being used. Rather, the court specified that the membership committee must admit or deny membership based on the criteria set forth in the bylaws.

As already noted, the bylaws do not specify that only the Supreme Council retains the right to decide who can be a member. If a dispute regarding the membership occurs, the special master will hear evidence whether the applicant meets the criteria set forth in the bylaws. The special master will settle disputes if necessary, but the special master must limit any determination to the fairness of the procedure. The special master will not be determining the criteria for membership or whether the applicant, does in fact, believe in Sikhism, the teachings of ten Gurus, Rehatnamas, or accepts Guru Granth Sahib as a living Guru.[28] In settling any dispute regarding

themselves, who could call meetings, record the minutes of these meetings and act as a liason [*sic*] with Executive Committee. [¶] 3. The Supreme Council meetings should be presided by Panj Pyaras on rotation basis. The subject of the meetings should be circulated among the members of the council before the scheduled date of the meeting."

[28] Appellants further complain that a dispute could emerge about what "regularly" attending a meeting means, which is a threshold requirement for membership. Appellants and respondents are to determine what "regularly" means and then apply it uniformly. If the parties cannot agree on a definition of "regularly," according to the court's order, the special master will hear evidence. As already stressed, the special master can ensure that procedures are being

membership, the special master cannot make any determinations regarding the qualifications of that person, but only as to whether the criteria or qualifications have been applied fairly to that person.[29]

## C. *Elections*

The trial court found that the term of office for each of the current Supreme Council members had expired and it ordered a new election by written ballot on January 12, 2003, pursuant to section 9418 (see fn. 12, *ante*). The court reserved jurisdiction over this matter.

Appellants declare that requiring or overseeing an election involves excessive entanglement. They claim that their expert testified that "[t]he Panj Pyaras are usually selected from the Sangat [congregation]." Since 1988, the Sikh Temple has used a nomination and affirmation process. A contested election, according to appellants, is antithetical to this process of achieving unanimity in decisions made by the congregation.

To the contrary of appellants' argument, the record establishes that elections have occurred at the Sikh Temple. More significantly, the bylaws require a vote of two-thirds of the Executive Committee to dismiss one of its members; they provide that "the majority vote will prevail" whenever the Executive Committee cannot reach a unanimous decision; they require a petition by at least one-fifth of the congregation to convene a special meeting of the general body; and they require a vote of three-fourths of the membership to amend the bylaws. Finally, appellants became members of the Supreme Council as a result of a court-supervised election after they had agreed that an election was the best way to resolve the leadership dispute.

Other than to state in a conclusory fashion that this ruling is an impermissible entanglement with religion, appellants fail to provide any analysis and avoid applying the *Lemon* test. (*Lemon, supra,* 403 U.S. at pp. 612–613.) The

---

applied fairly and not arbitrarily, but the special master cannot adjudicate the meaning of any religious term. We need not decide at this point whether the court would have jurisdiction to resolve the question of "regularly" attending if a dispute arises between appellants and respondents and the term remains undefined by the congregation, bylaws, or other authority in the Sikh Temple.

[29] To the extent that the court's statement of decision suggests that the special master can make such a determination, it is unconstitutional. At this point, no challenge has been made to the acceptance or rejection of an application for membership, and no adjudication has been made regarding a member's qualifications. Thus, at this time, the trial court has not exceeded its authority.

court's ruling—to impose a fair election that complies with the law—satisfies the first prong of the test in that the ruling has a secular purpose. The court clearly explained the need for a new election, as the court was unable to review the results of the election on March 31, 2002. The court could not discern the majority vote because, following each proclamation, "a cacophony of sound ensued with congregants voicing approval or disapproval simultaneously. [¶] Each party urges the court to weigh the decibel level of any distinguishable responses as recorded in videotapes of the meeting and make a ruling on the basis. **The court cannot determine a majority vote of either approval or disapproval from the evidence submitted.**" (Bold in original.) Moreover, the court noted that it was unclear whether the votes or verbal responses were limited to Sikh Temple members. The court explained: "The election procedure used on March 31, permitting approval and disapproval to be voiced simultaneously, is suspect because it is vulnerable to giving great weight to the loud or demonstrative voice of one person who may be a non-member and little weight to the soft or restrained voice of another who may be a member. All members have the same right to one, equally weighted vote. (Article X; Corp. Code 9310(a); 9331). Non-members have no right to participate in Temple elections."

With regard to the second prong, the court's order regarding an election does not advance or inhibit religion. Requiring an election does not convey a message of endorsement or disapproval of Sikh traditions. Rather, the evidence clearly supports the finding that a full, fair, and free election cannot be held unless it is completed by written ballot.

 Appellants appear to be arguing that this ruling violates the third prong of the *Lemon* test in that it fosters an excessive government entanglement with religion. (*Lemon, supra,* 403 U.S. at pp. 612–613.) However, as stressed *ante,* it is not the monitoring of a religious corporation that is prohibited, but the monitoring of the activity for its religious content, which may have the unintended effect of encouraging or discouraging religion. (*Id.* at p. 619.) "Certainly no directors of a corporation, whatever their number, may perpetuate themselves in office by refusing to call an election." (*Burnett, supra,* 130 Cal.App.2d at p. 634.) "It is clear that the court has the right when it appears that a corporation election will not be held because of the failure of its directors to call it, or that such directors will not conduct a free, fair and full election to order one held under court auspices. This is not an ecclesiastical matter but a corporation one." (*Id.* at p. 635.)

As discussed *ante,* the court had authority to order an election for the board of directors under the Corporations Code. The court merely sought to establish a procedure in which the majority of the congregation could be heard regarding their preference for who should be a member of the Supreme

Council. Section 9418, subdivision (c) provides: "The court, consistent with the provisions of this part and in conformity with the articles and bylaws to the extent feasible, may determine the person entitled to the office of director or may order a new election to be held or appointment to be made, may determine the validity of the issuance of memberships and the right of persons to vote and may direct such other relief as may be just and proper."

Accordingly, we conclude that the order to hold an election by written ballot did not violate the establishment clause of the First Amendment.

D. *Equal Time Requirement*

In its statement of decision, the trial court stated that appellants "shall preserve the religious purpose of Sunday Temple services. To the extent that defendants use Sunday Temple services as a platform to lobby for their retention or re-election, plaintiffs shall be afforded equal time, including the opportunity to address the congregation from the stage or platform." Appellants argue that enforcement of this order would impermissively require the court to determine whether the services did or did not "preserve the religious purpose" of the services.

We disagree. The court would not have to interpret any religious doctrine. Rather, the court would simply determine whether appellants advocated or discussed their retention or reelection. The court would not be interpreting or applying any religious doctrine, but would simply be ensuring that the election process was fair.

## IV. *Interpretation of the Bylaws*

Appellants argue that, even if the court had jurisdiction to interpret the bylaws and the relief it ordered did not violate the establishment clause of the First Amendment, the court erred when it interpreted the bylaws as failing to provide for a term of office for the Supreme Council. They assert that we must apply de novo review. When the trial court's interpretation is based solely upon the terms of the written instrument, and there is no conflict in the evidence, we review the ruling de novo. (E.g., *Peerless Lighting Corp. v. American Motorists Ins. Co.* (2000) 82 Cal.App.4th 995, 1005 [98 Cal.Rptr.2d 753].) Although we review the construction of the express terms of the instrument de novo, we review the evidence regarding the interpretation of the words under the substantial evidence test. (E.g., *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) We must uphold any factual determination of the trial court, express or implied, so long as there is substantial evidence in the record to support it.

(*Williams v. City of Belvedere* (1999) 72 Cal.App.4th 84, 89 [84 Cal.Rptr.2d 658].) If the evidence is conflicting, we must accept that which supports the trial court's decision and make all reasonable inferences in support of the judgment. (*Lake v. Reed* (1997) 16 Cal.4th 448, 457 [65 Cal.Rptr.2d 860, 940 P.2d 311].)

When interpreting the bylaws, the court properly used contract law and employed the applicable provisions of the Corporations Code. " 'It is generally accepted that corporate bylaws are to be construed according to the general rules governing the construction of statutes and contracts.' [Citation.] Bylaws must ' "be given a reasonable construction and, when reasonably susceptible thereof, they should be given a construction which will sustain their validity . . . ." ' [Citation.]" (*Sanchez v. Grain Growers Assn.* (1981) 126 Cal.App.3d 665, 672 [179 Cal.Rptr. 459].)

Appellants argue that Article IV, which concerns the dismissal of a Supreme Council member, specifies when a Supreme Council member may be removed. Article IV dictates that a member of the Supreme Council "can be dismissed" for breaking the Sikh code of conduct, as prescribed in Rehatnamas; for breaking the Sikh rule of objectivity by indulging in petty politics of factionalism and name calling; and for being unable to get along with the Supreme Council. They contend that the situations set forth in Article IV are the only grounds for removing a member of the Supreme Council and this bylaw does not provide for elections. In addition, they assert that Article V mandates a two-year term of service for members of the Executive Committee and therefore the bylaws would have spelled out the length of the term of office for the members of the Supreme Council if there had been an intent to limit it. Although they insist that we should review their challenge de novo because no factual issues are in dispute or are necessary to interpret the bylaws, they proceed to cite testimony of their witnesses and the paucity of any elections as support for the argument that the intent was for the Supreme Council members was to have life terms.

The evidence amply supported a finding that there was no consensus regarding the meaning of Panj Pyaras and the Gurmat tradition and that no religious authority had spoken on the subject. Appellants' argument regarding the dearth of elections is similarly unavailing. It is undisputed that elections were held for members of the Supreme Council by a majority voice vote of the congregation in 1988, which was pursuant to the newly adopted bylaws; by a majority vote in 1991 and 1993;[30] and by a court-supervised election in 1996. Thus, even if we agreed that evidence of no elections supported

---

[30] These votes following the resignation of four of the members of the Supreme Council in 1991 and all five members of the Supreme Council in 1993.

appellants' interpretation that the Supreme Council serves a life term, the evidence in the record establishes that elections have occurred.

We also reject appellants' argument that Articles IV and V support the conclusion that the Supreme Council has a life term. Article II concerns the selection procedure for members of the Supreme Council. It also specifies that another person will be selected if a member is "found unfit." Article IV concerns the situation when a member of the Supreme Council "can be dismissed" or be found unfit prior to the completion of the person's term of office. The fact that members can be dismissed does not mean that they otherwise serve indefinitely. Finally, Article V concerns the selection procedure for the Executive Committee. It is true that this Article limits the term for the Executive Committee member to two years, but this does not necessarily mean that the failure to specify a term for the Supreme Council indicates the intent to have the Supreme Council serve for life. Rather, it could also be argued that, if the intent was to have members of the Supreme Council appointed for life terms, Article II would have expressly provided for that.

The express terms of the bylaws provide for the selection of members of the Supreme Council, dismissal of members of the Supreme Council, and selection of and the terms of office for members of the Executive Committee. The bylaws are silent regarding the term of office for members of the Supreme Council.

Section 9210[31] requires that the activities and affairs of a nonprofit religious corporation, like the Sikh Temple, be conducted and its corporate powers be exercised under the direction of a board of directors, subject to the provisions of the Corporations Code and to "any provisions in the articles or bylaws." The bylaws of a religious corporation "may provide for the tenure, election, selection, designation, removal, and resignation of directors." (§ 9220, subd. (a).) Subdivision (b) of section 9220 provides: "In the absence of any provision in the articles or bylaws, the term of directors shall be one year." Since the bylaws were silent regarding the term of office for members of the Supreme Council, the trial court properly ruled that the members of the Supreme Council had a one-year term pursuant to section 9220, subdivision (b).

---

[31] Section 9210 reads: "Subject to the provisions of this part and any provision in the articles or bylaws: [¶] (a) Each corporation shall have a board of directors. The activities and affairs of a corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the board. [¶] (b) The board may delegate the management of the activities of the corporation to any person or persons provided that the activities and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the board."

## DISPOSITION

The judgment is affirmed. Respondents are awarded costs.

Kline, P. J., and Haerle, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 14, 2004. Kennard, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.