Filed 1/2924  Tayefeh v. Kern Medical Center CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FARZIN TAYEFEH et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>KERN MEDICAL CENTER et al.,<br><br>Defendants and Respondents. | F085103<br><br>(Super. Ct. No. BCV-15-100647)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Fenton Law Group, Benjamin J. Fenton and Dennis E. Lee for Plaintiffs and Appellants.

Hall Hieatt Connely & Bowen, Mark B. Connely and Stephanie A. Bowen for Defendants and Respondents.

-ooOoo-

**INTRODUCTION**

Plaintiff and appellant Farzin Tayefeh, M.D. (Tayefeh), along with Farzin Tayefeh, M.D., Inc. (collectively, plaintiffs), appeal from a judgment in favor of defendants and respondents Kern Medical Center (KMC) and the County of Kern (collectively, defendants). The parties dispute whether KMC's bylaws allowed for the termination of Tayefeh's temporary hospital privileges without hearing and appellate rights. Following a bench trial, the court found KMC did not violate its medical staff bylaws[1] in terminating Tayefeh's temporary privileges at KMC without hearing and appellate rights, plaintiffs had not proven any damages caused by KMC as a result of the privilege termination, and defendants are immune from liability even if KMC had violated the bylaws and caused plaintiffs damages.

On appeal, plaintiffs argue the trial court erred as a matter of law in construing and applying KMC's bylaws to the facts of the case, in finding no damages, and in concluding KMC was immune from liability. Finding no error, we affirm.

**BACKGROUND**

A general legal framework provides context for the parties' dispute regarding KMC's bylaws and the termination of Tayefeh's temporary privileges.

**I.    General Legal Background**

Along with numerous statutory and regulatory laws designed to address the interests of patients, physicians, and hospitals, as well as concomitant public policy concerns, hospitals are statutorily obligated to report to the Medical Board of California (MBC)[2] certain adverse actions taken by a peer review body with respect to denying,

---

[1]    All further references to bylaws are to the KMC medical staff bylaws unless indicated otherwise.

[2]    The MBC is a consumer protection agency within the Department of Consumer Affairs consisting of a 15-member board of eight physicians and seven public members appointed by the Governor, the Speaker of the Assembly, and the Senate Rules Committee. (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 7; Bus. & Prof. Code, §§ 101, subd. (b), 2001, subds. (a)–(c).) The

terminating, suspending, or reducing a physician's staff privileges. Specifically, section 805 requires that a report be filed with the applicable licensing agency when, as a result of an action of a peer review body, "A licentiate's membership, staff privileges, or employment is terminated or revoked for a medical disciplinary cause or reason[]" or "Restrictions are imposed, …, on staff privileges, membership, or employment for a cumulative total of 30 days or more for any 12-month period, for a medical disciplinary cause or reason." (*Id.*, subd. (b)(2), (3).) Staff privileges are defined to include, among other things, temporary privileges. (*Id.*, subd. (a)(4).) The statute defines "'Medical disciplinary cause or reason' [to] mean[] that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (*Id.*, subd. (a)(6).)

In addition to the duty to report such adverse actions to the MBC, hospitals also have a duty to provide certain protections to a physician in proceedings regarding his or her staff privileges—a duty which was originally grounded in the common law doctrine of fair procedure. (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 986 (*El-Attar*); see *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 815 ["a physician may neither be refused admission to, nor expelled from, the staff of a hospital, *whether public or private*, in the absence of a procedure comporting with the minimum common law requirements of procedural due process"].)

In 1989, California implemented a peer review process to "'protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct"'" and the Legislature codified the common law fair procedures

---

purposes of the MBC are to protect consumers from incompetent, grossly negligent, unlicensed, impaired, or unethical practitioners, among other things. (*Arnett v. Dal Cielo, supra*, at p. 7.)

All statutory references are to the Business and Professions Code unless indicated otherwise.

a hospital must afford practitioners in the peer review process in sections 809 to 809.8. (*El-Attar, supra*, 56 Cal.4th at p. 988.)

The specific type of notice and hearing fair process rights that physicians are to be provided during peer review processes are codified under sections 809.1–809.4, but those sections do not apply to county and state hospitals as KMC was during the relevant time period (§ 809.7). Nonetheless, county and state hospitals are obligated to provide fair procedures and due process to physicians through notice and an opportunity to be heard in matters affecting membership privileges. (*Ibid.*)

To comply with these requirements, California law requires an acute care hospital's medical staff to adopt written bylaws that establish formal procedures for evaluating "staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and government body deem appropriate." (Cal. Code Regs., tit. 22, § 70703, subd. (b).) The medical staff is required to provide a means of enforcing its bylaws, including adoption of a peer review process, which is subject to the minimal procedural standards set by the statutes and by the law entitling physicians to fair procedure. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1482.) Hospitals are obligated to materially comply with the medical staff bylaws (*El-Attar, supra*, 56 Cal.4th at pp. 990–991; see § 809.6, subd. (a)), and hospital governing boards are prohibited from acting in an arbitrary or capricious manner with respect to peer review matters (§ 809.05, subd. (a)).

Pursuant to these obligations, KMC's bylaws provide for ongoing monitoring and quality assessment of the medical staff, and describe peer review and corrective action procedures that may be taken against the medical staff. A physician who applies for or is awarded *full* staff membership may not have his or her hospital privileges denied, reduced, suspended, or terminated for *any* reason without hearing and appellate procedures as provided in the bylaws. However, a physician awarded only temporary

4.

staff privileges, as opposed to full staff membership privileges, is subject to KMC's

bylaws provision 7.5-4(C), which provides as follows:

> "Temporary privileges may at any time be terminated, with or without cause, by the president of staff, the chair of the department, or the medical director after conferring with either of the foregoing. **The practitioner shall be entitled to the hearing and appellate rights afforded in Article XIII of these bylaws only if temporary privileges are terminated or suspended for medical disciplinary cause or reason.** In all other cases, the individual shall not be entitled to any hearing and appellate rights based upon an adverse action involving temporary privileges. All persons requesting or receiving temporary privileges shall be bound by the bylaws, rules and regulations of the medical staff. All practitioners with temporary privileges will be subject to the proctoring procedure of the medical staff." (Boldface added.)

In article XII, provision 12.2–5(K), which sets out actions that may be taken by

the medical executive committee in peer review processes, the bylaws utilize the standard

*medical disciplinary cause or reason* as defined in section 805, subdivision (a)(6): "If

the medical executive committee takes any action that would give rise to a hearing

pursuant to Bylaws, Section 13.2, it shall also make a determination whether the action is

a 'medical disciplinary' action or an 'administrative disciplinary' action. A medical

disciplinary action is one taken for cause or reason that involves that aspect of a

practitioner's competence or professional conduct that is reasonably likely to be

detrimental to patient safety or to the delivery of patient care. All other actions are

deemed administrative disciplinary actions. In some cases, the reason may involve both

medical disciplinary and administrative disciplinary cause or reason, in which case, the

matter shall be deemed medical disciplinary for hearing purposes pursuant to Bylaws,

Article 13, Hearing and Appellate Reviews."

In 2015, KMC abruptly terminated Tayefeh's hospital privileges after it

discovered an MBC accusation had been filed against Tayefeh seeking revocation or

suspension of his medical license that he had not previously disclosed to KMC. Plaintiffs

argue the basis for terminating Tayefeh's privileges was a medical disciplinary cause or

5.

reason under bylaws provision 7.5–4(C), which triggered hearing and appellate rights that were not afforded to Tayefeh; they seek damages in tort for KMC's purported failure to provide Tayefeh hearing and appellate rights provided in the bylaws.

## II.     Factual Background

Tayefeh and his spouse are both anesthesiologists.  Tayefeh's spouse (A.B.) was involved in a vehicle accident in November 2011 after he purportedly ran a red light and struck another vehicle while driving under the influence (DUI).  A.B. was charged for DUI, and, in March 2012, a charge for exhibition of speed under Vehicle Code section 23109, subdivision (c), was added.  A.B. pleaded nolo contendere to the latter charge, and the remaining charges were dismissed.  An investigation of A.B. was initiated by the MBC, and the agency filed an accusation against A.B. in June 2013 seeking revocation or suspension of his medical license.

The MBC's allegations against A.B. detailed that Tayefeh and A.B. had been cross-prescribing each other various controlled substances including Xanax, Ambien, and hydrocodone.  A.B. was accused of gross negligence in his care of Tayefeh for, among other things, cross-prescribing controlled substances to Tayefeh while maintaining a personal relationship with him and without conducting physical examinations or maintaining complete and accurate records.  On October 14, 2014, a stipulated settlement and disciplinary order was entered wherein A.B. admitted the complete truth and accuracy of each and every allegation in the accusation.  The disciplinary order revoked A.B.'s medical license, stayed that revocation, and placed A.B. on probation for three years subject to various terms and conditions.  Tayefeh was interviewed by the MBC on May 8, 2012, and again on November 18, 2013, regarding his treatment of A.B.  Tayefeh appeared with counsel for the second interview.

In the fall of 2014, Tayefeh began searching for a new anesthesiology position after the hospital where he was working in San Diego lost a contract with an insurance provider and became over-staffed.  Tayefeh applied for an anesthesiologist position

through Resource Anesthesiology Associates of California, PC (Somnia), a private group of anesthesiologists that had an exclusive agreement with KMC to send qualified anesthesiologists to provide services to KMC. Tayefeh signed a two-year independent contractor professional services agreement with Somnia in November 2014. Under the agreement, Tayefeh was to be paid a weekly amount based on 56 hours of work per week at the hospital, but the agreement was subject to immediate termination if, among other things, Tayefeh failed to obtain clinical privileges from KMC, or his privileges were suspended or revoked by KMC.

Tayefeh then completed KMC's "APPLICATION FOR PATIENT-SPECIFIC AND LOCUM TENENS TEMPORARY PRIVILEGES." The application sought information about whether he had ever had his license to practice medicine in any jurisdiction denied, limited, restricted, suspended, revoked, not renewed, or subject to probationary conditions, or whether he had been fined or received a letter of reprimand from a licensing agency, or whether he was subject to such a pending action. He answered "No" to this question.

As part of the application, Tayefeh received and agreed to by bound by the KMC medical staff bylaws. Section 6.4–2(K) of the bylaws provides that by applying for appointment to the medical staff, the applicant agrees that if membership and privileges are granted, the applicant has "an ongoing and continuous duty to report to the medical staff office within ten (10) days any and all information that would otherwise correct, change, modify or add to any information provided in the application or most recent reappointment application when such correction, change, modification or addition may reflect adversely on current qualifications or membership or privileges."

Tayefeh's privileges application was granted for the period of January 5, 2015, through March 4, 2015. At trial, KMC's medical staff coordinator, Tracy Subriar, testified Tayefeh had applied for, and was granted only, temporary privileges. She explained this was typical for anesthesiologists who entered into independent contractor

7.

agreements with Somnia; they initially applied for temporary privileges, the approval of which was an abbreviated process that could be completed in four to six weeks, and the only people who had to sign off on granting these privileges were the chair of the anesthesiology department and the president of the medical staff. If the anesthesiologist with temporary privileges performed well, he or she would be given a further application to apply for full staff membership privileges, which was a much lengthier and in-depth process that Tayefeh never underwent.

After Tayefeh was granted privileges in December 2014, he found an apartment in Bakersfield and began providing services at KMC on January 5, 2015. Meanwhile, however, springing from the MBC's investigation of Tayefeh and his spouse's cross-prescribing activities, the MBC filed an accusation against Tayefeh on December 31, 2014, which was mailed to Tayefeh's Los Angeles address. The MBC notified KMC of the accusation against Tayefeh on January 21, 2015. According to Tayefeh, at the time he applied for privileges with KMC in November 2014, he had no idea the MBC was investigating him or that the MBC would challenge his license. Although he had twice been interviewed by the MBC regarding his treatment of A.B., the most recent of which had been in November 2013 for which Tayefeh had legal counsel, Tayefeh thought the interviews related solely to the investigation and accusation against A.B. Moreover, Tayefeh testified, the accusation was sent to his Los Angeles address, so he had no idea it had been filed until KMC was notified.

As soon as KMC was notified of the accusation on January 21, 2015, KMC's Chief Medical Officer, Glenn Goldis; Chief Executive Officer, Russell Judd; and Dr. Arash Heidari, President of the Medical Staff, discussed the MBC accusation. Goldis testified he recommended to the group, and they agreed, to terminate Tayefeh's temporary privileges due to his failure to disclose the accusation, which they all believed was not a medical disciplinary cause or reason under KMC bylaws provision 7.5-4(C). Goldis subsequently met with Dr. Chou Yang, the chair of the anesthesiology

8.

department, and informed him that Tayefeh's privileges had been terminated based on the nature of the MBC accusation and the fact Tayefeh did not disclose the accusation to KMC. Goldis asked Yang to inform Somnia that Tayefeh no longer had privileges at KMC, he would need to be removed from clinical duties, and Somnia would not be able to use Tayefeh's services to fulfill its contract with KMC.[3] At Yang's request, Goldis sent an e-mail to Yang confirming these details and stated Tayefeh's privileges were being terminated based on the nature of the MBC's accusation and his failure to notify KMC of the accusation. Goldis's e-mail also indicated that, "[i]n accordance with KMC bylaws, Dr. Tayefeh is not entitled to any hearing or appellate rights." At the time, Goldis did not know that Tayefeh was unaware the accusation had been filed.

At Goldis's direction, Yang met with Tayefeh at the end of the day to deliver that information and the two discussed the nature of the accusation. Tayefeh denied he had any knowledge of being under investigation by the MBC, and when asked by Yang about the specific nature of the accusation, Tayefeh commented that he did not think it was a "big deal" to write prescriptions for family members, friends or acquaintances, which surprised Yang. Had Yang been aware of the accusation, he would not have signed Tayefeh's application for temporary privileges. According to Tayefeh, he was notified in the middle of a case that Yang wished to see him; after asking Tayefeh to leave the operating room, he was abruptly released from service. Tayefeh testified he was told nothing about why he was being asked to leave KMC, and he had no recollection of discussing the accusation with Yang.

Somnia subsequently sent a letter to Tayefeh stating the independent contractor relationship between them was terminated effective January 27, 2015, under

---

**3** Like Tayefeh, Yang provided services to KMC through Somnia, and had been designated the chair of the anesthesiology department. Somnia's agreement with KMC required Somnia to designate a department chairperson who had overall responsibility for the administration of services under the agreement with KMC, pursuant to KMC medical staff bylaws, rules and regulations.

section 6.3.i.9 of the professional services agreement between Somnia and Farzin Tayefeh, M.D., Inc., which provided the agreement could be terminated for cause if Tayefeh's clinical privileges were revoked.

Tayefeh filed suit against defendants alleging several claims, including one under section 809 et seq. and a common law claim for violation of Tayefeh's right to fair procedure. Following demurrer proceedings, plaintiffs' only remaining claim was one for damages and framed under section 809 et seq. At summary judgment, Tayefeh characterized the claim as a violation of section 809.6, subdivisions (a) and (b), based on KMC's alleged failure to provide Tayefeh hearing and appellate rights under the bylaws in terminating his hospital privileges.

At the hearing on KMC's summary judgment motion, the trial court explained that conflicting evidence created a disputed issue of fact as to the meaning of the phrase *medical disciplinary cause or reason* in bylaws provision 7.5–4(C). The case proceeded to trial, where expert testimony was offered by KMC as to the meaning of medical disciplinary cause or reason contained in the bylaws. Plaintiffs' expert, however, was deemed unqualified and was precluded from testifying. The question of interpretation of the bylaws was given to the jury to resolve, which initially deadlocked before reaching a nine-to-three verdict finding KMC had not materially violated the bylaws. Plaintiffs appealed, arguing the trial court erred by excluding their expert witness as unqualified. We agreed with plaintiffs, reversed the judgment, and remanded the case for further proceedings. (*Tayefeh v. Kern Medical Center* (Oct. 5, 2020, F077060) [nonpub.opn.] (*Tayefeh I*).)[4]

---

[4] On our own motion, we take judicial notice of the record on appeal filed with this court in *Tayefeh I*. (Evid. Code, §§ 451, subd. (a), 452, subd. (d), 459, subd. (a); see *Dwan v. Dixon* (1963) 216 Cal.App.2d 260, 265 ["a court may take judicial notice of the contents of its own records"].)

On remand, the parties agreed to a court trial. One of the central issues was whether Tayefeh's privileges were terminated for a medical disciplinary cause or reason, which would entitle him to hearing and appellate rights under the bylaws. This issue turned on the meaning and application of *medical disciplinary cause or reason* as provided in the bylaws.

In addition to fact and percipient witness testimony admitted at trial, experts testified on the meaning and application of the phrase medical disciplinary cause or reason as used in the bylaws to frame hearing and appellate rights upon termination of temporary privileges under bylaws provision 7.5–4(C). Plaintiffs' expert, Arthur Chenen, explained that as understood in the community, a medical disciplinary cause or reason extends to any conduct by a physician, even conduct outside a clinical situation, that is reasonably likely to be detrimental to patient safety or the delivery of patient care, regardless of whether it involves patient safety or delivery of patient care at KMC. To be a medical disciplinary cause or reason, the basis for termination must "typically" have some nexus to patient care of some kind. Chenen testified a medical disciplinary cause or reason encompasses such things as "dissatisf[action] with the doctor's medical practice, honesty, prescribing practices, whether in the hospital or somewhere else," and these bases for termination of privileges would trigger hearing rights.

Allan Pont, M.D., KMC's expert, testified the basis for KMC's termination of Tayefeh's privileges was not a medical disciplinary cause or reason. According to Pont, a medical disciplinary cause or reason is something that involves the care of a patient, and a nonmedical reason is any other issue that does not involve the care of a patient. Pont indicated a medical disciplinary reason involves a physician showing some sort of incompetence toward patients. In his opinion, the termination of Tayefeh's privileges in these circumstances did not amount to a medical disciplinary cause or reason. On cross-examination, Pont explained that dishonesty of a physician is a professional conduct issue, but termination of privileges on that basis is not a *medical* disciplinary cause or

11.

reason as that phrase is understood. A *medical* disciplinary cause or reason is meant to differentiate clinical situations from nonclinical situations.

Following trial, the court issued a tentative decision; as ordered, KMC proposed a consistent statement of decision, which the trial court subsequently signed. The trial court found Tayefeh had applied for and received only temporary privileges, and that Tayefeh's privileges were terminated *solely* because he had failed to disclose the accusation to KMC. The trial court credited Pont's testimony as to the meaning of *medical disciplinary cause or reason*, and concluded termination based on a failure to disclose was not a medical disciplinary cause or reason under the circumstances of the case. Moreover, the trial court found plaintiffs had not proven any damages caused by KMC, and concluded, alternatively, KMC was immune from liability under Government Code sections 815.2 and 820.2.

Plaintiffs appeal again, arguing the trial court erred as a matter of law in concluding Tayefeh's privileges were not terminated for a medical disciplinary cause or reason, and argue the trial court erred in finding that plaintiffs had not proven any damages. Plaintiffs also maintain the trial court erred in finding KMC was immune from liability.

**DISCUSSION**

This case proceeded to trial on a single claim for wrongful termination of hospital privileges, framed around KMC's obligation to materially comply with its own bylaws (§ 809.6, subd. (a)) and to provide due process of law (§ 809.7). The parties agreed in their closing trial briefs that plaintiffs' claim of wrongful termination of hospital privileges sounds in tort. The generic elements of a tort claim are "wrongdoing, causation, and harm." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) Thus, to establish entitlement to relief, plaintiffs were required to prove that KMC's duty under the bylaws to provide a hearing and appellate rights was materially breached by KMC—either intentionally or negligently—and caused plaintiffs damages. (See

12.

generally *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [to establish liability on a negligence theory, the plaintiff must prove duty, breach, causation and damages]; see also Evid. Code, § 500 [party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief the party is asserting].)

The trial court decided each element of plaintiffs' claim in favor of KMC, finding plaintiffs had not established KMC materially breached the bylaws and, alternatively, even assuming a material breach, that plaintiffs had failed to prove any damages, let alone any damages caused by KMC. Plaintiffs argue the trial court erred as a matter of law in construing KMC's bylaws and in finding no damages were proven. KMC maintains the trial court's construction and application of the bylaws and its findings as to damages are reviewed for substantial evidence, and both were amply supported.

## I.     Material Breach of the Bylaws

### A.     Meaning and Scope of the Bylaws

The trial court found Tayefeh applied for and received only temporary privileges from KMC. Thus, whether KMC materially violated the bylaws hinged on whether KMC terminated Tayefeh's temporary privileges for a reason that amounted to a *medical disciplinary cause or reason*, which was the threshold for triggering hearing and appellate rights as provided under bylaws provision 7.5–4(C).

Based on the parties' arguments presented during the bench trial, and as we explained in *Tayefeh I*, the parties have differing interpretations of the term medical disciplinary cause or reason. The bylaws define medical disciplinary cause or reason in bylaws provision 12.2–5(K) as one taken for cause or reason that involves that aspect of a practitioner's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care. KMC contends this encompasses only professional conduct related to some type of clinical situation relevant to patient care at KMC. KMC offered the testimony of Pont to support this understanding and application. Plaintiffs, on the other hand, argue the scope of medical

13.

disciplinary cause or reason may include discipline for *any* professional conduct inside or outside a clinical situation that has a nexus to patient safety or care. Plaintiffs offered Chenen's testimony to support this interpretation.

KMC's bylaws frame hearing and appellate rights for revocation of temporary privileges around the medical disciplinary cause or reason standard articulated in section 805, subdivision (a)(6).[5] In *Tayefeh I*, after supplemental briefing about how the bylaws should be interpreted in light of section 805, we concluded the construction question presented in this very narrow context was not one of statutory interpretation, but involved an interpretation of a written instrument (the bylaws) to which contract interpretation principles applied.[6] We noted that because a hospital's reporting obligations under section 805 are framed around the same standard (medical disciplinary cause or reason), any reasonable interpretation of the bylaws had to be consistent with the policy objectives and purposes underpinning section 805. In other words, no *reasonable* interpretation of medical disciplinary cause or reason as used in the bylaws could undercut or dilute KMC's reporting obligations under section 805.

Pursuant to this interpretational framework, we deemed plaintiffs' expert qualified to offer an opinion on the meaning and scope of medical disciplinary cause or reason as a matter of industry custom and usage; the matter was remanded to the trial court for further proceedings and a bench trial followed. On retrial, the trial court admitted conflicting expert testimony as to the meaning of the bylaws and their application to the facts surrounding Tayefeh's privilege termination, decided all factual issues in KMC's

---

[5] Even though section 805 is relevant to the interpretive issue, the parties' dispute is *not* whether KMC violated its reporting obligation under section 805.

[6] At the first trial, the interpretation and application of medical disciplinary cause or reason was submitted to the jury to resolve as a disputed factual issue, and the jury was instructed on contract interpretation principles to decipher its meaning in light of expert testimony admitted on the issue.

14.

favor, and concluded KMC had not violated the bylaws by failing to afford Tayefeh hearing and appellate rights.

Without acknowledging this context or how we analyzed the interpretation issue in *Tayefeh I*, plaintiffs argue the construction and application of the bylaws is a mixed question of law and fact subject to de novo review. Although it is not entirely clear why, plaintiffs contend that what constitutes a medical disciplinary cause or reason is an issue of law, and because the dispositive facts are undisputed, the trial court's determination is reviewed de novo. KMC maintains the trial court's decision must be examined under the substantial evidence standard as the trial court's construction of the bylaws turned on conflicting expert testimony, and points out that the doctrine of implied findings applies under Code of Civil Procedure sections 632 and 634 because plaintiffs did not object to the trial court's statement of decision.[7]

When a claim for relief depends on the interpretation of a written instrument, courts apply well-established rules of construction to construe the document. (See, e.g., *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 753–754 (*Smith*) [applying contract interpretation principles to deduce the meaning of hospital bylaws in reviewing grant of injunctive relief, but emphasizing that doing so may be dependent on the nature of the provisions and bylaws at issue]; *Singh v. Singh* (2004) 114 Cal.App.4th 1264, 1294 (*Singh*) [interpreting nonprofit religious corporation bylaws under contract interpretation principles to determine whether board of directors had life terms]; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746–747 [contract interpretation principles applied to interpret husband's law practice's partnership agreement to ascertain division

---

[7] The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. The doctrine applies when a statement of decision is requested under Code of Civil Procedure section 632 and, pursuant to Code of Civil Procedure section 634, the appellant fails to bring any ambiguities or omissions in the statement of the decision to the trial court's attention by objecting. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58–59 (*Fladeboe*).)

of certain marital assets upon divorce]; *McLear-Gary v. Scott* (2018) 25 Cal.App.5th 145, 157–159 [contract interpretation principles applied to interpret written covenants, conditions, and restrictions to determine existence and scope of easement].)

When there is an ambiguity as to the meaning of a writing that turns on the credibility of conflicting extrinsic evidence, as here, the interpretation presents a question of fact that is resolved by the trier of fact. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866; *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351.) Upon review in such instances, the appellate court must accept any reasonable interpretation adopted by the trial court. (*Parsons, supra*, at p. 866.) In this case, the scope and meaning of medical disciplinary cause or reason as defined in the bylaws turned on conflicting expert testimony, which the trial court resolved in KMC's favor by crediting Pont. Pont's testimony established he is a board certified physician in endocrinology and internal medicine. He has been a part of various hospital administrations, including acting as Chief Medical Officer and Vice President for Medical Affairs at California Pacific Medical Center in San Francisco. He has been involved in negotiating multiple exclusive provider agreements between hospitals and contracting groups; he has been personally involved in many peer review proceedings in hospitals where physician privileges were at issue, including a situation that resulted in terminating a physician's locum tenens privileges, like that with KMC and Dr. Tayefeh.

Pont testified that to constitute a medical disciplinary cause or reason, the at-issue professional conduct had to be related to a clinical situation. Crediting this testimony, and in conjunction with the definition of medical disciplinary cause or reason supplied in bylaws provision 12.2–5(K), the trial court implicitly construed the scope of medical disciplinary cause or reason as limited to discipline for conduct involving a clinical situation that is reasonably likely to be detrimental to patient safety or the delivery of patient care. This is a reasonable interpretation of the scope of medical disciplinary cause

16.

or reason as defined in the bylaws, and it is notably consistent with how that phrase has been understood and applied under section 805.

*Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628 (*Abrams*) is illustrative. In *Abrams*, a hospital had an exclusive agreement for pathology services (a closed department arrangement) with a medical corporation for which Dr. Abrams was the director. (*Id.* at p. 632.) When Abrams made statements during a medical malpractice deposition the hospital regarded as erroneous, the hospital terminated the exclusive contract under a without-cause provision therein, and this triggered the automatic termination of hospital staff membership and privileges of Abrams and his staff doctors. (*Id.* at p. 634.) Uncontradicted deposition testimony of the hospital's chief executive officer indicated the decision to terminate the contract was not based on quality care issues or Abrams's medical competence; rather, the chief executive officer testified it put into question his professional integrity, honesty, professional judgment and the ability to run the pathology department. (*Ibid.*)

On appeal from the denial of a preliminary injunction sought by Abrams and his medical corporation, the appellate court concluded Abrams had contracted away any medical staff hearing rights he had with respect to the termination of his privileges. The court noted section 809.6, subdivision (c), prohibits contract waivers of a health care provider's rights to review final peer review actions proposing discipline amounting to a medical disciplinary cause or reason under section 805, but summarily concluded Abrams's privileges were not terminated for a medical disciplinary cause or reason, and section 805 simply did "not come into play." (*Abrams, supra*, 25 Cal.App.4th at p. 639.)

Abrams's clinical skills were undisputedly not in question, and the perceived dishonesty at issue was completely unrelated to any clinical situation and thus could not constitute a medical disciplinary cause or reason. (*Abrams, supra*, 25 Cal.App.4th at p. 634.) The fact that *Abrams* involved an exclusive contract termination does not render that case inapposite as plaintiffs argue. As the *Abrams* court noted, because section 805

17.

was not triggered, the court had no reason to address whether section 809.6's prohibition on contract waivers of a physician's hearing and appellate rights would ever impact contractual relationships involving closed departments. (*Id.* at p. 639.)

On the opposite end of the spectrum, when the undisputed facts underlying a hospital's decision to terminate privileges involve a physician's conduct *in a clinical situation* that is *unquestionably detrimental to the delivery of patient care*, the termination is squarely based on a medical disciplinary cause or reason within the meaning of section 805. (*Alaama v. Presbyterian Intercommunity Hospital, Inc.* (2019) 40 Cal.App.5th 55 (*Alaama*).) *Alaama* involved a bad-tempered doctor who signed a written behavior agreement with the hospital following episodes of verbally and physically inappropriate and unprofessional behavior. (*Id.* at p. 58.) After the agreement was signed, Alaama was involved in a situation where nurses and technicians were trying to reach a medically distressed patient to provide him with a bed, but Alaama refused to move the cart where he was charting and precluded staff from assisting the patient. (*Id.* at p. 59.) As a result of this incident, Alaama's privileges were revoked without a hearing, and the hospital determined it would not have to file a section 805 report because no action had been taken for a medical disciplinary cause or reason. (*Alaama, supra*, at pp. 60–61.) The medical executive committee stated Alaama's privileges were terminated because Alaama had failed to address the safety concerns and patient care needs expressed by the operating room staff, and a letter from the chief of staff to Alaama explained that Alaama had violated the agreement by inhibiting the hospital staff from providing a bed for a vomiting patient. (*Id.* at p. 66.)

On appeal from the trial court's subsequent denial of a writ sought by Alaama, the hospital tried to characterize the basis for privilege termination as a violation of the agreement's requirement that Alaama discuss patient concerns expressed to him by the staff. (*Alaama, supra*, 40 Cal.App.5th at p. 66.) The hospital argued that because the patient was not actually in danger, the episode did not involve conduct that was

18.

reasonably likely to be detrimental to patient safety or to the delivery of patient care and could not constitute a medical disciplinary cause or reason for reporting purposes under section 805 such that it triggered notice and hearing rights under section 809.1. (*Alaama, supra*, at p. 66.) In rejecting this argument, the appellate court explained that even if Alaama's conduct was not dangerous to *patient safety*, the hospital ignored the undisputed fact that Alaama had hindered the delivery of patient care by preventing hospital staff from providing a patient with a bed, which fell squarely within the definition of medical disciplinary cause or reason provided in section 805, subdivision (a)(6). (*Alaama, supra*, at p. 66.)

*Abrams* and *Alaama* present a consistent understanding of *medical disciplinary cause or reason* to what Pont described in his testimony and support the reasonableness of the meaning the trial court adopted—to constitute a medical disciplinary cause or reason as that phrase is defined in the bylaws and in section 805, subdivision (a)(6), the basis for the termination must relate to professional conduct in a clinical situation that is reasonably likely to be detrimental to patient safety or the delivery of patient care.

Plaintiffs maintain a termination of privileges for a failure to disclose is effectively a termination for dishonesty, which has been frequently held to implicate patient safety even when the dishonesty at issue occurs outside a clinical situation. Plaintiffs argue that as a matter of law any narrow interpretation of medical disciplinary cause or reason that does not include termination for dishonest professional conduct is incorrect and unreasonable. Plaintiffs rely on *Ellison*, but this case does not persuasively advance plaintiffs' argument.

*Ellison* involved a hospital board's decision, after several layers of peer review proceedings, to terminate a physician's privileges for displaying a serious lack of candor, honesty and integrity in answering questions about his training and background during peer review proceedings where his clinical skills were in question. (*Ellison v. Sequoia Health Services* (2010) 183 Cal.App.4th 1486, 1498 (*Ellison*).) Following subsequent

19.

writ proceedings, the appellate court upheld the board's decision as being a reasonable reconsideration of the penalty imposed by an intermediate peer review decision. (*Ibid.*) The court explained the medical staff bylaws permitted the board to exercise its independent judgment as to what constitutes a reasonable penalty for unethical behavior. In electing to terminate Ellison's privileges, the board "reasonably determined that Ellison's failure to honestly and completely respond to the questions about his board certification examinations and his reasons for leaving [his] residency was behavior that could jeopardize patient safety in the future." (*Ibid*.) The court found this reasonable because "[a] physician who conceals information about himself to protect his reputation might well withhold information about a case if it reflected negatively upon his skills as a practitioner." (*Ibid.*)

While the hospital board concluded the physician's lack of candor and honesty *could* potentially jeopardize patients' safety in the future such that it justified privilege termination, whether the termination was one for medical disciplinary cause or reason was not considered. (*Ellison, supra*, 183 Cal.App.4th at p. 1498.) Moreover, Ellison's dishonesty about his training and medical residency background went to the very heart of what concerned the hospital about his clinical skills as demonstrated in clinical situations. (*Ibid.*) In that way, Ellison's dishonesty was directly linked to clinical situations where the hospital already had concerns about his patient care (*id.* at p. 1490), and the facts of *Ellison* do not undercut a construction of medical disciplinary cause or reason to be limited to professional conduct related to a clinical situation that is reasonably likely to be detrimental to patient safety or to the delivery of patient care.

Plaintiffs also rely on medical license revocation cases that involved criminal convictions for the proposition that a physician's nonclinical conduct outside a clinical situation *can* implicate patient safety. (*Windham v. Board of Medical Quality Assurance* (1980) 104 Cal.App.3d 461, 470 [income tax fraud reflects on physician's qualifications to practice medicine]; *Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 770 [three

20.

DUI convictions rationally relate to patient safety, providing logical connection to fitness to practice medicine].)  Like *Ellison*, these cases do not involve any interpretation or application of the phrase *medical disciplinary cause or reason*.  Rather, they recognize that *criminal* conduct occurring outside the practice of medicine may form the basis for imposing licensing discipline because such conduct reflects on a licensee's fitness and qualifications to practice medicine.  (*Griffiths, supra*, at p. 773; *Windham, supra*, at pp. 469–470.)  The nexus between a physician's conduct and the fitness and qualifications to practice medicine is broader in licensing discipline cases, and does not involve the reasonably likely nexus required for discipline amounting to a medical disciplinary cause or reason.  (*Windham, supra*, at pp. 470–471 [nexus under § 490 requires crime be substantially related to qualifications, functions or duties of profession for which license sought to be revoked or suspended was issued]; *Griffiths, supra*, at pp. 770–771 [nexus between conviction and physician's fitness or competence to practice medicine requires a logical connection between the two].)  These discipline cases do not provide a persuasive basis for construing the scope of medical disciplinary cause or reason under the bylaws.

In sum, the trial court's implicit construction of the bylaws is not undermined or unreasonable in light of decisional authority considering section 805 or licensing discipline issues, and is supported by Pont's testimony, which constitutes substantial evidence.

### B.      Application of the Bylaws to the Facts

Turning to the application of the construed bylaws to the facts here, determining the meaning of a writing may be treated as distinct from the application of that meaning to the facts presented.  (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390–391 (*Scheenstra*), citing *Smith, supra*, 182 Cal.App.4th at p. 754, fn. 17.)  Here, the trial court had to determine the precise reason why Tayefeh's temporary privileges were terminated before deciding whether that reason(s) amounted to a medical

disciplinary cause or reason. Although plaintiffs argue it was undisputed that there were two grounds for terminating Tayefeh's privileges, the trial evidence was in conflict in this regard.

When Goldis conferred with Judd and Heidari about the accusation against Tayefeh, Goldis testified he recommended that KMC discontinue Tayefeh's temporary privileges because "the information that was disclosed to [KMC] from the [MBC] was prior to unknown to us, and it was [Goldis's] understanding at the time and still is that Dr. Tayefeh had an obligation to notify [KMC] of any such potential action against him. When we were surprised by this information it—we realized that what he had indicated on his application was contrary to this information and therefore we believed that at the time and I [Goldis] still believe to this day that the—that he may not have intentionally but in fact misrepresented himself on his application."

After the group made the decision to terminate Tayefeh's privileges, Goldis spoke with Yang. Yang testified Goldis told him that, after discussing the matter with Judd and Heidari, based on the nature of the accusation and the fact that Tayefeh had not disclosed that he was under investigation, KMC was going to suspend his temporary privileges. Goldis asked that Yang relay that information to Somnia, but Yang asked Goldis to send that request in writing so that Yang could forward it on to Somnia.

Goldis then sent an e-mail to Yang as follows:

"Pursuant to our conversation today re: Farzin Tayefeh, MD, please notify Somnia that we are releasing Dr. Tayefeh from KMC effective immediately. [¶] This decision is based on the nature of the accusation filed to the [MBC] Case # 10-2013-234880. In addition, Dr. Tayefeh failed to notify KMC Medical Staff Office of the accusation before he began Locum services.

"Therefore, please make sure any scheduled shifts for Dr. Tayefeh are covered and notify Somnia that his Locums privileges with KMC are terminated. In accordance with KMC bylaws, Dr. Tayefeh is not entitled to any hearing or appellate rights."

22.

At trial, Goldis explained "[t]he statement in the e-mail to Dr. Yang refers to the fact that I was concerned about the nature of the accusation but it was not the basis of my decision."

This conflict as to the basis of the termination presented an issue of fact for the trial court to decide. "[W]hen the facts to which a [written instrument] must be applied are disputed or require the weighing of evidence, the application of that provision presents a question of fact" and is reviewed for substantial evidence. (*Scheenstra, supra*, 213 Cal.App.4th at p. 391, fn. 15; see *Singh, supra*, 114 Cal.App.4th at p. 1294 ["If the evidence is conflicting, we must accept that which supports the trial court's decision and make all reasonable inferences in support of the judgment."].) The trial court found that "Goldis credibly testified that the decision to terminate [Tayefeh's] temporary privileges was based on [Tayefeh's] failure to disclose to KMC the Medical Board Investigation and Accusation, a non-medical reason having nothing to do with [Tayefeh's] clinical skill or practice at KMC." In the factual findings section, the trial court explained the reason for the termination was "based on the fact KMC was unaware of the MBC matter, [Tayefeh] should have disclosed it but failed to do so, and the termination was due solely to a non-medical cause, having nothing to do with [Tayefeh's] clinical skills or patient care at KMC [citation]." The trial court expressly concluded "[Tayefeh's] non-disclosure was the reason his temporary privileges were immediately terminated, and the reason why no hearing was required under the bylaws."

Goldis's testimony, although in tension with the e-mail he sent to Yang, constitutes substantial evidence to support the trial court's finding. (*Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 260 [testimony of a single witness, unless impossible or inherently improbable, will be sufficient to support challenged findings].) The trial court considered Goldis's e-mail's reference to the nature of the

accusation, but rejected this as the basis for the termination.[8]  The trial court's finding the privileges termination was based solely on Tayefeh's failure to disclose the accusation (as opposed to the nature of the accusation) was supported by substantial evidence even though the court could have drawn different inferences and conclusions from the evidence.  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 [where substantial evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld].)

Finding this to be the termination basis, the trial court concluded it was not a medical disciplinary cause or reason.  There was no evidence the failure to disclose was related to a clinical situation.  Even viewed as an act of dishonesty, the conduct bore no relationship to a clinical situation like in *Ellison*, where the physician was not honest and candid about his training and background after specific clinical situations raised questions in peer review proceedings about his training and experience.  Rather, as the trial court noted, the facts were more akin to *Abrams*, where the physician's perceived dishonesty had nothing to do with any clinical situation or the physician's clinical skills.  Moreover, even if the failure to disclose could somehow be linked to a clinical situation in an abstract sense, there is no factual basis to conclude the conduct was *reasonably likely* to be detrimental to patient safety or to the delivery of patient care.  The failure to timely disclose the accusation *itself* did not bear on Tayefeh's clinical skills, especially given the uncontradicted testimony of Yang and Goldis indicating KMC had absolutely no concerns about Tayefeh's clinical skills or abilities.  And, although disputed by Chenen,

---

**8**      While the trial court discussed the nature of the accusation referenced in Goldis's e-mail to Yang, it did so to explain why that would not constitute a medical disciplinary cause or reason even *if* it had made up the basis for the termination.  To the extent there is any ambiguity in the trial court's statement of decision regarding the basis for the termination, that ambiguity must be resolved in favor of the prevailing party because plaintiffs did not object to the statement of decision.  (*Fladeboe, supra*, 150 Cal.App.4th at p. 60 [appellate court will infer trial court made implied factual findings favorable to the prevailing party on all issues, including the omitted or ambiguously resolved issues]; Code Civ. Proc., § 634.)

24.

the trial court credited Pont's testimony that terminating privileges for the failure to disclose an MBC accusation would not amount to a medical disciplinary cause or reason. The trial court's conclusion that terminating privileges for the failure to disclose did not amount to a medical disciplinary cause or reason was reasonable and factually supported.

Plaintiffs argue the trial court erred as a matter of law in finding that Tayefeh was required to disclose the MBC *investigation* in his application and under the bylaws because, according to plaintiffs, the MBC investigation was not a pending action until it became a filed accusation.[9] Whether the failure to disclose the investigation (as opposed to the MBC accusation itself) was required by the privileges application (or even the bylaws) is irrelevant. Bylaws provision 7.5–4(C) allowed KMC to terminate Tayefeh's temporary privileges without any cause—Tayefeh's disclosure failure did not need to violate the bylaws for KMC to be entitled to terminate temporary privileges. Moreover, the failure to disclose the *accusation* timely was a violation of bylaws provision 6.4–2(K).

In sum, the trial court's construction of the bylaws was reasonable in view of the conflicting expert evidence, the relevant facts found by the trial court are supported by substantial evidence, and there was no error of law or fact in the trial court's application of the construed bylaws to the relevant facts.

## II.     Damages

Plaintiffs argue the trial court erred in finding they had not proven any damages.

Consistent with the general rule imposing on a party the burden of proving the existence or nonexistence of each fact essential to a claim for defense (Evid. Code, § 500), plaintiffs had the burden of proving a material breach of KMC's duties under the

---

[9]     The privileges application Tayefeh completed asked whether his license to practice medicine had been limited, restricted, suspended, revoked, not renewed or subject to any such actions, or whether he had been fined or received a letter of reprimand or *whether such action was pending*. Plaintiffs argue the MBC investigation does not fall into any of these categories, and Tayefeh properly answered no to this attestation question on his application.

bylaws, causation, and the existence and extent of any damages suffered. (See generally *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 813 [observing that a plaintiff in any tort case bears the burden of proving by a preponderance of the evidence both the existence and the amount of damages proximately caused by the defendant's tortious acts or omissions].)

Here, the trial court expressly concluded Tayefeh had not proven any damages. The trial court explained that Tayefeh's temporary privileges would have expired on March 4, 2015, if they had not been terminated on January 21, 2015, and would not have been renewed. Thus, the only lost earnings potentially suffered and attributable to KMC's purported wrongful termination were those between January 22, 2015, and March 4, 2015. The trial court found that Tayefeh had presented no evidence regarding the days he was scheduled to work during that time period. As for the damages for emotional harm plaintiffs claimed, the trial court found that Tayefeh's testimony regarding his emotional distress was not convincing, and any turmoil or emotional distress Tayefeh claimed to have sustained in the past was "transient, fleeting and trivial."

Where the factfinder rules a party has not met its burden of proof at trial, the standard of review is not substantial evidence, but "'whether the evidence compels a finding in favor of the appellant as a matter of law,'" and specifically, "'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; see *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.)

Plaintiffs fail to acknowledge the standard of review related to the trial court's finding that plaintiffs did not meet their burden of proof as to damages, and they point to no evidence that requires an award of damages as a matter of law. Plaintiffs offered no evidence Tayefeh was scheduled to work between February 22, 2015, and March 4, 2015,

to establish any income loss for that period. Plaintiffs argue the fact that Tayefeh's temporary privileges were otherwise set to expire on March 4, 2015, does not cut off any loss of income after that date. However, the evidence established KMC would not have renewed Tayefeh's privileges after March 4, 2015, due to the existence of the MBC accusation—Yang testified he would not have approved Tayefeh's initial temporary privileges had he known about the accusation, and Tayefeh himself testified it was his understanding no hospital would grant him privileges during the pendency of the accusation. Nothing contradicted this evidence, let alone established lost income as a matter of law from February 22, 2015, through the end of the contract term with Somnia. There is no basis to reverse the trial court's finding as to damages.

As a result, even if the trial court erred in concluding there was no material breach of the bylaws (which it did not), there can be no prejudice in light of plaintiffs' failure to prove entitlement to any damages. Because the trial court's conclusion that plaintiffs did not prove their wrongful termination claim must be affirmed, we do not reach the trial court's alternative conclusion that defendants were immune from liability under Government Code sections 815.2 and 820.2.

## DISPOSITION

The court's judgment is affirmed. Defendants are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

MEEHAN, J.

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.

27.